**Ernest N. MORIAL et al.**

v.

**JUDICIARY COMMISSION OF the STATE OF LOUISIANA.**

Civ. A. No. 76–3795.

United States District Court, E. D. Louisiana.

March 2, 1977.

---

Jefferson & Bryan, Trevor G. Bryan, William J. Jefferson, Sidney M. Bach, Cotton, Jones & Dennis, Charles E. Cotton, Arthur A. Lemann, III, Gerdes & Valteau, Louis A. Gerdes, Jr., New Orleans, La., for plaintiffs.

Donald B. Ensenat, New Orleans, La., for defendants.

CASSIBRY, District Judge.

This suit was heard on January 31, 1977. Plaintiffs sought a preliminary injunction and declaratory relief. Defendants' motions to dismiss, and, alternatively, for summary judgment, were also heard. Defendants' motions were denied. A written Order was issued granting plaintiffs' motions for declaratory judgment and for injunction on February 2, 1977. In that Order, the Court indicated that it would issue written Findings of Fact and Conclusions of Law in due course. The following are those Findings of Fact and Conclusions of Law.

IT IS ORDERED that the Order Staying the Effects of the Preliminary Injunction of February 7, 1977, and issued on February 10, 1977, be, and hereby is, SET ASIDE, and that the Order of February 7, 1977, be, and it is hereby, restored to its full effect.

## FINDINGS OF FACT

1. In 1972, Plaintiff, Ernest N. Morial, was elected Judge of the Court of Appeal, Fourth Circuit, State of Louisiana, and

holds the office under the authority of Article 7, Section 9 of the Constitution of Louisiana of 1921, now superseded by the provisions of Article 5, Section 22 of the 1974 Louisiana Constitution.

2. Plaintiffs, James F. Clark, Jesse A. Dupart, Luke Fontana, Dyan H. French, Marie J. Galatas, Carl Galmon, Robert F. Guesnon, Russell J. Henderson, Cheryl H. Huffine, Larry Jones, Carol G. Lobenstein, Novyse E. Soniat, and Christine B. Valteau, are residents of the United States and registered voters of the City of New Orleans. Some, or all, of these plaintiffs have voted for plaintiff Morial in past political elections in which he was a candidate including his election to the Louisiana House of Representatives, to be Judge on the Orleans Parish Juvenile Court, and to his present judgeship.

3. Named as defendants are the Judiciary Commission of the State of Louisiana, its members, the Louisiana Supreme Court, its members, Governor Edwin Edwards, individually and in his capacity as Governor of Louisiana, William Guste, individually and in his capacity as Attorney General of the State of Louisiana, and Paul C. Hardy, individually and in his capacity as Secretary of State of Louisiana.

4. The Judiciary Commission is obligated by law to enforce the provisions of the Code of Judicial Conduct for the State of Louisiana, including Canon 7(A)(3). *See, In re Haggerty*, 257 La. 1, 241 So.2d 469 (1969). Governor Edwin Edwards, Attorney General William Guste, and Secretary of State Paul C. Hardy are all obligated to enforce the provisions of Louisiana R.S. 42:39 adopted by the Louisiana Legislature in 1968. This Statute prohibits any person presently serving as an elected or appointed Judge of any Court, except those persons serving as justices of the peace, from qualifying as a candidate for *any* nonjudicial local, state or national office without first resigning his judgeship. The Statute further provides that any person elected or appointed Judge of any Court shall not be required to resign his judgeship if that person seeks to qualify as a Judge for the same or any other Court.

5. The predecessor of Article 5 of the 1974 Constitution, Article VII of the 1921 Constitution, as amended, provided that the judiciary of Louisiana shall, except in certain narrow circumstances, be elected. The durations of the various judicial offices as set forth in the Constitution are uniformly shorter than those set forth in the 1921 Constitution.

6. Article V, Section 22(A), of the 1974 Constitution provides that all Judges shall be elected, except as otherwise provided by law. Article V, Section 25, provides for a Judiciary Commission. This Commission is generally empowered to supervise the conduct of the judiciary of the State of Louisiana. It is authorized to recommend to the Supreme Court of Louisiana that a Judge be censured, suspended, or removed from office for violation of certain enumerated acts of misconduct. Section 22 also empowers the Supreme Court to promulgate rules to implement this Section.

7. The Louisiana Supreme Court, pursuant to the supervisory powers granted it in Article V, Section 5(A), adopted a Code of Judicial Conduct on March 5, 1975. Based upon the model Code of Judicial Conduct of the American Bar Association, this Code contains Canon 7(A)(3). Canon 7(A)(3) provides that a Judge presently holding a full time judicial office should resign such office when he becomes a candidate, either in a party primary or a general election, for any nonjudicial office. The only exception to this prohibition is that a Judge may serve as a delegate to a State Constitutional Convention if the law so provides.

8. The direct predecessor of the present Judiciary Commission, the Committee on Judicial Ethics, enforced the provisions of Canons XIX and XX of the Canons of Judicial Ethics. These Canons, the direct predecessors of Canon 7(A)(3), also provided that a Judge must resign his office before he could become a candidate for any nonjudicial office. Canon XX provided that a Judge should resign so that "it cannot be said that he is using the power or prestige of his judicial position to promote his own candidacy, or the success of his party."

9. The provisions of Canons XIX and XX and the provisions of La.R.S. 42:39 have been enforced in the past against Judges who sought to run for nonjudicial office without first resigning their judicial office. *In re Haggerty*, 257 La. 1, 241 So.2d 469 (1969).

10. Plaintiff Morial has indicated that he intends to become an active candidate for the nonjudicial office of Mayor in the 1977 election. The Statute and Canon prevent him from doing so without resigning his present office. The thirteen other plaintiffs, all registered voters for the Parish of Orleans and all active supporters of plaintiff Morial in the past, have indicated their intent to assist the campaign of plaintiff Morial in the 1977 mayoralty and vote for plaintiff Morial in the 1977 open primary for Mayor. The Statute and Canon prevent plaintiffs from carrying out their intent unless Morial resigns his judgeship.

11. By letter dated October 15, 1976, plaintiff Morial requested that the Louisiana Supreme Court grant him a leave of absence, without pay, from January 1, 1977 through November 3, 1977. The purpose of this leave of absence was to allow plaintiff Morial to participate as a candidate in the 1977 campaign for the office of Mayor of the City of New Orleans. In his letter plaintiff Morial stated that his request for leave was made in the light of the prohibition of Canon 7(A)(3).

12. By letter dated October 21, 1976, the Louisiana Supreme Court, in response to plaintiff Morial's letter, unanimously denied plaintiff Morial's request to be granted a leave of absence. In a subsequent letter by plaintiff Morial to the Louisiana Supreme Court Committee on Judicial Ethics dated November 3, 1976, plaintiff Morial inquired whether, in the light of Canon 7(A)(3) he was prohibited from engaging in activities to solicit support for his contemplated campaign for Mayor. On December 2, 1976, the Committee replied unanimously stating that Canon 7(A)(3) prohibits such a course of action. The Committee maintained that plaintiff must first resign his office before he announced his candidacy for that office.

The Committee did state, however, that plaintiff Morial could make a "preliminary survey" in order to find out the degree of financial support and voter support that he could expect to receive after he formally announced his candidacy.

13. During the course of deliberations on the request of Judge Morial, Eugene J. Murret, Judicial Administrator, recommended four alternative courses of action that the Louisiana Supreme Court could adopt in answering the request of Judge Morial. Three of the four alternatives were less restrictive than the alternative eventually adopted. These three recommendations did not require Judge Morial to resign immediately from the bench if he became a formal candidate for Mayor. Additionally, two of the recommendations did not require that he resign until he actually qualified as a candidate in August of 1977. Indeed, these latter recommendations may even have been implemented in such a way so as not to require Judge Morial to resign unless he were elected Mayor. The four recommendations were:

1. Grant a leave of absence, without any conditions or qualifications. In this instance, if Judge Morial commits any judicial improprieties or misuses the judicial office, perhaps proceedings would be instituted against him by the Judiciary Commission.

2. Grant a leave of absence, with qualifications and conditions, e. g., prohibit the use of the title judge, require that he resign the office if he qualifies for the mayoralty election, make it clear that he is not absolved of the responsibility for complying generally with the Code of Judicial Conduct and is not protected by the court's order from possible action by the Judiciary Commission for any abuses.

3. Grant a leave of absence only up to the time of the qualifying period (August 6–11, 1977) rather than through November 30, 1977 as requested, on the grounds that a present state statute would require him to resign anyway in August 1977 if he qualifies (if

he has the statute declared unconstitutional after an order granting leave to August 1977, he can always come back later to have the order extended through the qualifying and election period; such a shortened order could be either unrestricted (as in No. 1) or conditioned (as in No. 2)).

4. Refuse to grant the leave of absence.

14. Plaintiff Morial has indicated he objects to the requirement that he resign his judgeship, and seeks declaratory and injunctive relief. The thirteen other named plaintiffs state that they desire plaintiff Morial to retain his judgeship and become an active candidate for Mayor.

15. The Canon and Statute significantly affect and infringe upon important interests of plaintiffs. These include the right to vote, rights of expression and association, and the right to be a candidate for public office.

16. No inherent corrupting influence upon candidates has been shown to exist in political campaigns.

17. No inherent corrupting influence upon candidates has been shown to exist in political campaigns in which judicial officers run for nonjudicial office.

18. No differences have been shown to exist between the conduct of a political campaign for a judicial office and the conduct of a political campaign for a nonjudicial office, and the evidence in the record supports the contention that such campaigns are conducted in the same ways.

19. There has been no showing that the requirement that a Judge abstain from running for a nonjudicial office while a Judge will affect the Judge's ethics or the respect of the public for a Judge and the judiciary, nor has there been a showing that this requirement is needed to reassure the public that a Judge will be fair and impartial in the discharge of his duties. The net effect of the Canon and the law is that while the Judge is required to regularly and frequently subject himself to the approval of the electorate for judicial office, he may run for nonjudicial office only under severe restrictions, and at a tremendous risk.

20. Arguments are legion on both sides of the question of whether Judges should be elected or appointed. Louisiana, in its wisdom, has chosen the former, thus involving Judges in politics as much as any other elected official. Since it has, then it may not treat Judge-Candidates any different than it treats other candidates.

21. Having Judges on the bench whose decisions are free of political influence and who are able to vote their conscience is greatly to be desired, and should be encouraged. But when Judges run for reelection or for another judgeship or for a nonjudicial office, particularly when they are required to run frequently, they become just as "politicized" as any other candidate. In Louisiana, Judges raise money, engage in political oratory, make campaign promises, appeal to various political and racial groups, advertise in the media, and run under political party labels in the same way as do other candidates running for nonjudicial office.

22. It is true that the type of Canons and laws at issue here were originally promulgated by people who on the whole have never been Judges, who have not been in the political arena on a frequent basis, and who have not had to make a choice of resignations before running for another political office. Theirs is an idealistic approach, but far from realistic.

23. No evidence was presented to prove that a Judge who takes a leave of absence while running for a political office will somehow be less respected as a Judge, or be less honest or impartial or fair if he loses and returns to the judgeship. A fairer inference is that he will be a better Judge because he will have done what the people of Louisiana have said that they like, and that is that he has been out and talked to the people and updated himself concerning their fears and aspirations.

24. It is far easier for nonjudges or even Judges who are appointed to pontificate about cleansing the judiciary if they have never had to do battle in the political arena in a State where Judges are as fair a game as any other candidate, and politics is played to the hilt.

25. When Judges are required to run almost as frequently as all other candidates for office, headlines in newspapers often state that a Judge is "affiliated with this or that political organization or faction." There is campaign oratory that a Judge is a "strict constructionist" or "civil righter" or a "liberal" or "conservative" or "hard" or "soft" or "compassionate" with respect to persons charged with crime.

26. The State seeks to have the best of both worlds. It frequently subjects its Judges to the rigors of political campaigns, and then deprives them of a most valuable political right—the right to run for another office without resigning the judgeship.

27. The Canon and Statute would make far more sense in the cases of Judges who are appointed, or who, after being elected, are required to run against their record rather than against a person. While the Canon and Statute have a noble purpose, they do little to enhance the integrity of the judiciary. If any harm to Judges results from politics as such, then it comes from the fact that the State requires Judges to regularly subject themselves to the political process.

28. I think it may be safe to say that the State requires Judges to run for political office so that they can be constantly reminded that they may not always vote their conscience, but must seriously consider in every decision they make the prejudices and biases of the electorate. It makes a mockery of the constant admonition that Judges receive that they should not succumb to public clamor. Indeed, life appointments have been severely criticized by many, because such Judges too often decide cases contrary to the views of the general public. And the argument has been made that had these Judges been subjected to periodic elections, their decisions would have been quite different.

29. In sum, the State's policy is hypocritical. It requires a Judge to be constantly seasoned in the political process, and then seeks to gloss over this political exposure by the thin facade of the Canon and Statute, which are designed to give the public the idea that even though Judges are elected, that they are not necessarily required to engage in politics at election time.

30. None of these findings should be construed as accusing any State Judge of being politically motivated in any decision he might render. Without exception, I am convinced that they decide their cases fairly and impartially, based on the law and evidence.

31. Viewed against the reality of the full involvement in politics, then there is no rational basis for thus distinguishing between Judges who run for reelection or for a higher judicial office and Judges who run for nonjudicial office.

32. There are numerous less onerous alternatives to requiring resignation of plaintiff Morial in order for him to run for nonjudicial office. Some of them would adequately protect the State in vindicating their interest in a fair and impartial judiciary and the appearance of being fair and impartial. Under the circumstances he would remain subject to the Code and the law if he conducted himself improperly.

33. Plaintiffs other than Morial named in the complaint have voted for Morial in the past and desire that he be a candidate for Mayor so that he may espouse the issues in which they have an interest and so that they may have the opportunity to vote for him in the next mayoralty election.

34. Other candidates for Mayor have already announced their candidacy, have begun to solicit funds to influence voters, to take polls, and to organize political campaigns.

35. Plaintiff Morial is suffering, and will continue to suffer, irreparable harm unless a preliminary injunction issues to bar the enforcement of the referenced Canon and Act.

36. One stated purpose of the Act and the Canon is to prevent a Judge from using the prestige of his office in his campaign for a nonjudicial position.

37. A judge who resigns his office to run for a nonjudicial position may trade on

the prestige of his former position with as much effect as a Judge who takes leave of absence from his judicial position to run for a nonjudicial office.

38. Judges are presently permitted under State law to "use" the prestige of their office in their campaign for reelection or election to a higher judicial office.

39. Nonjudicial elected officials are presently permitted to "use" the prestige of their office in their campaigns for other nonjudicial offices or for judicial offices.

## CONCLUSIONS OF LAW

■ 1. The Court has judicial power under Article III of the United States Constitution and is authorized under 28 U.S.C. § 1343(3) (1970), 28 U.S.C. §§ 2201–202 (1970), and 42 U.S.C. § 1983 (1970) to adjudicate plaintiffs' claims for declaratory and injunctive relief with respect to the constitutionality of La.R.S. 42:39 and Canon 7(A)(3) of the Code of Judicial Conduct of Louisiana. *Steffel v. Thompson*, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974); *Golden v. Zwickler*, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969); *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

■ 2. Plaintiffs' claim that the Statute and Canon violate the equal protection clause of the Fourteenth Amendment of the United States Constitution is "ripe" for adjudication. The Statute and Canon both provide that a Judge must resign his office before he becomes a candidate for nonjudicial elective office. This requirement is not placed upon other nonjudicial elected office holders. Plaintiffs have pursued all possible avenues of relief according to the laws of Louisiana. The only other step which plaintiff Morial could take would be to violate the Statute and Canon by becoming a full fledged candidate for Mayor, thereby risking censure, fine, and possible removal from office. The law does not require that plaintiffs violate a law in order to have a "justiciable" controversy. *Steffel v. Thompson*, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974): *Golden v. Zwickler*, 393 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113

(1969); *Aetna Life Insurance Company v. Haworth*, 300 U.S. 27, 57 S.Ct. 461, 81 L.Ed. 617 (1937).

■ 3. Plaintiffs have standing to raise the issue of the unconstitutionality of the Statute and Canon as being in violation of the First and Fourteenth Amendments to the Constitution. Plaintiff Morial has standing to assert such violations because he is "injured in fact" by defendants' actions and because the interest which he seeks to protect is "arguably within the zone of interests to be protected or regulated by the Statute or Constitutional guarantee in question." *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970); *Barlow v. Collins*, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970). The thirteen other plaintiffs have standing because the Statute and Canon infringe upon their right to vote and their right to freely associate in the upcoming electoral campaign. *See, e. g., Reed v. Giarrusso*, 462 F.2d 706 (5th Cir. 1972); *National Student Association v. Hershey*, 134 U.S.App.D.C. 56, 412 F.2d 1103 (1969); *Johnson v. Rockefeller*, 58 F.R.D. 42, 46–47 (S.D.N.Y.1973); *Moore v. Moore*, 229 F.Supp. 435 (S.D.Ala. 1964).

4. There is a concrete, actual controversy between the parties who have adverse legal interests. This controversy perforce touches the legal relations of the parties. The controversy is capable of being resolved through a specific decree which will be conclusive in character through injunction or otherwise. The Court will not be issuing an "advisory opinion" in any sense of that term. *Aetna Life Insurance Co. v. Haworth*, 57 S.Ct. 461, 300 U.S. 227, 240–241, (1937); 13, Wright, Miller & Cooper, *Federal Practice and Procedure*, § 3529 (1975).

■ 5. A Federal claim arising under 42 U.S.C. § 1983 (1970) is supplementary to any State remedies that may be available to the plaintiffs. There is no requirement in the present case that plaintiffs exhaust State remedies in order for this Court to assert jurisdiction over the § 1983 claims.

608

*Houghton v. Shafer*, 392 U.S. 639, 88 S.Ct. 2119, 20 L.Ed.2d 1319 (1968); *Hobbs v. Thompson*, 448 F.2d 456 (5th Cir. 1971); *Hall v. Garson*, 430 F.2d 430 (5th Cir. 1970); *Mortillaro v. State of Louisiana*, 356 F.Supp. 521 (E.D.La.1972).

■ 6. The principles of comity and "federalism" do not serve to bar this Court from granting declaratory or injunctive relief. No proceeding in State Court is pending in this controversy concerning the Statute and Canon of either a civil or criminal nature. Therefore, abstention is not warranted. *Steffel v. Thompson*, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974); *Canton v. Spokane School District*, 498 F.2d 840 (9th Cir. 1974); *Indiana State Emp. Ass'n, Inc. v. Boehing*, 511 F.2d 834 (5th Cir. 1975).

■ 7. The Statute and Canon create a "chilling" and inhibitory effect upon the exercise of plaintiffs' rights of freedom of speech and freedom of association guaranteed by the First Amendment of the United States Constitution. *Dombrowski v. Pfister*, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1968); *NAACP v. Button*, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1970); *Garrison v. Louisiana*, 379 U.S. .64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964); *National Student Association v. Hershey*, 134 U.S.App.D.C. 56, 412 F.2d 1103 (1969); *Reed v. Giarrusso*, 462 F.2d 706 (5th Cir. 1972); *Hobbs v. Thompson*, 448 F.2d 456 (5th Cir. 1971); *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); *Gray v. City of Toledo*, 323 F.Supp. 1281 (N.D.Ohio 1971). It is widely recognized that freedom of speech as guaranteed by the First Amendment occupies a "preferred position" in our constitutional scheme. *See, e. g., Kovacs v. Cooper*, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949); McKay, *The Preference of Freedom*, 34 N.Y.U.L.Rev. 1182 (1959). The reason for such deference is obvious. Without that freedom, all of the other rights guaranteed by our Federal Constitution would be meaningless because without freedom of expression, none of the other rights could be implemented.

■ 8. The Statute and Canon "chill" and inhibit plaintiff Morial's rights to freedom of speech and freedom of association. Freedom of association and expression are inherent in the process of becoming a candidate for public office. *Williams v. Rhodes*, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968); *Lubin v. Panish*, 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974); *Mancuso v. Taft*, 476 F.2d 187, 195–98 (1st Cir. 1973); *Hobbs v. Thompson*, 448 F.2d 456 (5th Cir. 1971). Indeed, the right to become a candidate for public office has been held to be a right protected by the First Amendment *because* the rights of freedom of speech and association are inherent in, and are inextricably intertwined with, the process of becoming a political candidate. Running as a candidate for public office is one means by which these rights are implemented. *Mancuso v. Taft, supra*, at 196; *Williams v. Rhodes, supra*; *Hobbs v. Thompson, supra*.

■ 9. The activities embraced by the concept of candidacy, including, but not limited to, public debates, soliciting campaign funds, advocating viewpoints on the political issues of the day, organizing a political party, canvassing supporters, and the distribution of handbills have traditionally been granted First Amendment protection because they implement *both* the rights of freedom of speech and freedom of association. *See, e. g., Whitney v. California*, 274 U.S. 357, 47 S.Ct. 641, 71 L.Ed. 1095 (1927); *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *United States Civil Service Commission v. National Association of Letter Carriers*, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973); *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 613, 46 L.Ed.2d 659 (1976); *Mancuso v. Taft, supra; Hobbs v. Thompson, supra; Lecci v. Cahn*, 360 F.Supp. 759 (E.D.N.Y.1973); *Gray v. City of Toledo*, 323 F.Supp. 1281 (N.D.Ohio 1971).

■ 10. Freedom to associate encompasses the right to support a candidate of one's choice, to hear that candidate's views on the issues of the day, and to assist in developing support for that candidate.

Such freedom contemplates people forming a group which will support the candidate of their choice. This right to form a political party is an integral part of implementing the freedom to associate. All of these actions are also intimately associated with implementing and making effective an individual's rights to freedom of expression. *Williams v. Rhodes, supra; Bullock v. Carter,* 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972); *Lubin v. Panish, supra; Mancuso v. Taft, supra;* and *Hobbs v. Thompson, supra.*

11. The Statute and Canon prohibit only *some,* not *all,* public officials, in the present case Judges, from becoming candidates for nonjudicial office. In evaluating candidacy restrictions for purposes of ascertaining the standard of review, not only must the rights of the potential members of the affected class be considered but also the rights of the public at large. This is so because a restriction upon who may become a candidate inevitably restricts the right to vote. As stated by Chief Justice Burger in *Bullock v. Carter, supra,* 92 S.Ct. at 856, "The rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters." *See also, Mancuso v. Taft,* 476 F.2d 192–94. In the present context, the effect of this candidacy restriction is more than "theoretical" because a uniquely qualified class of public officials is denied the right to freely run as a candidate for a nonjudicial office. This restriction has caused an immediate adverse effect upon *all* voters, including the thirteen plaintiffs and all others who may have made plaintiff Morial their choice in the open primary for the 1977 mayoralty election. These latter voters will be denied the right to vote for the announced candidate of their choice if the Statute and Canon are enforced. *Williams v. Rhodes, supra; Bullock v. Carter, supra; Mancuso v. Taft, supra.*

12. In evaluating restrictions on candidacy, the function of the Federal Courts is to "examine in a realistic light the extent and nature of their impact on voters." *Bullock v. Carter,* 92 S.Ct. at 856. The Statute and Canon significantly affect the rights of voters because they indirectly and substantially limit the pool of candidates from which a nonjudicial elected official may be chosen. Because these restrictions are directed to only *one class* of potential candidates and because this potential class of candidates is uniquely qualified to serve as public officials because of their training and experience, the Statute and Canon discriminate against the voters and their right to vote by limiting the range and number of potential candidates. *Mancuso v. Taft,* 476 F.2d at 193–94; *Williams v. Rhodes, supra.* Because the Statute and Canon restrict the "fundamental" rights of the thirteen named plaintiffs, such as the right to vote and the right to work for the candidate of their choice, and their First Amendment rights of freedom of expression and association, these prohibitions substantially affect the rights of this group. *Mancuso v. Taft, supra; Williams v. Rhodes, supra; Bullock v. Carter, supra.*

13. As stated by the Court in *Harper v. Virginia Board of Elections,* 383 U.S. 663, 666, 86 S.Ct. 1079, 1081, 16 L.Ed.2d 169 (1966), "[i]t is enough to say that once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause." By requiring a member of the affected class to choose between becoming an active candidate for a nonjudicial office and resigning or not running at all, the Statute and Canon not only produce a chilling effect upon the exercise of First Amendment rights of *all* the plaintiffs, but also require a Judge to make the extremely difficult choice of either giving up his judgeship or giving up the candidacy. The effect of these prohibitions not only infringes upon the First Amendment rights of freedom of association and freedom of speech, but also significantly inhibits the exercise of these and other interrelated "fundamental" rights of plaintiffs. One obvious way in which resignation infringes upon these rights and "chills" their exercise is by requiring a

Judge to give up, perhaps *permanently*, what may be his only source of income *before* that Judge may even officially qualify for the nonjudicial office. La.R.S. 42:39; *Bullock v. Carter*, 405 U.S. at 143, 92 S.Ct. at 849; *Williams v. Rhodes, supra; Mancuso v. Taft*, 476 F.2d at 193–95.

■ 14. From the above analysis of the law, it is obvious that the right to become a candidate for public office is both a "fundamental" interest and a right inherent in, and intertwined with, the rights of freedom of association and freedom of speech protected by the First Amendment. Because of these factors, the "strict scrutiny" mode of equal protection analysis must be applied by the Court. *Bullock v. Carter, supra; Williams v. Rhodes, supra; Lubin v. Panish, supra; Mancuso v. Taft, supra; Hobbs v. Thompson, supra.*

15. The right to run for public office is *not* a "privilege" conferred upon plaintiff by State law as defendants maintain. The case of *United Public Workers v. Mitchell*, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947), is relied upon heavily by defendants to support the proposition that public office is a "right" not a privilege. The *Mitchell* case has been drained of much of its vitality by the development of constitutional doctrine within the past quarter century. The deference given by the *Mitchell* Court to legislative judgment concerning restrictions on an individual's First Amendment freedom for the good running of government has not been subscribed to in recent decisions. *See, e. g., Sweezy v. State of New Hampshire*, 354 U.S. 234, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957); *Sugarman v. Dougall*, 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973); *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Hobbs v. Thompson, supra. See generally* Van Alstyne, *The Demise of the Right—Privilege Distinction in Constitutional Law*, 81 Harv. L.Rev. 1439 (1968). As stated in *Elrod v. Burns*, 96 S.Ct. at 2684, "[T]his Court now has rejected the concept that Constitutional rights turn upon whether a governmental benefit is characterized as a 'right' or as a 'privilege'." It is an accepted fact that

government, as an employer, has increased in size so as to become a large scale employer. *See, e. g.*, Emerson, *The System of Freedom of Expression*, 568 (1970); U.S. Bureau of the Census, Statistical Abstract of the United States (1976 Ed.). It is also widely recognized that there has been an enormous increase in the number of laws and regulations which the State must enforce. Together, these factors undermine the argument that government employment is a "privilege". As stated by Van Alstyne, *supra*, at 1461, "[W]ith the increasing size of government as an economic unit . . . it is simply no longer true that a particular infringement related to employment by government is no greater than a particular infringement made by a private employer." In *Hobbs v. Thompson*, 448 F.2d at 472–74, the Fifth Circuit refused to accept the right-privilege distinction as set forth in *Mitchell*.

■ 16. Both the Statute and Canon significantly and substantially burden each of the "fundamental" interests involved in this case and unduly restrict the First Amendment rights of the plaintiffs. Both the Statute and Canon are burdensome to the exercise of these fundamental rights and restrict the exercise of First Amendment freedoms by inhibiting, or curtailing, the exercise of the fundamental rights and the implementation of the First Amendment freedoms. The plaintiffs' fundamental rights to vote and to run for office are burdened because they cannot vote for the announced candidate of their choice and because plaintiff Morial cannot become an announced candidate for the office of Mayor. The First Amendment freedoms of plaintiffs are also substantially infringed upon because plaintiffs are not able to implement their rights to associate in a political campaign thereby making concrete their rights of freedom of expression by having plaintiff Morial, their standard bearer, run for Mayor in 1977. *C. F. Williams v. Rhodes, supra; Bullock v. Carter, supra; Mancuso v. Taft, supra; Hobbs v. Thompson, supra.*

17. The State has a substantial interest in the regulation of the mode by which these "fundamental" interests and First Amendment Rights are implemented. However, the regulation of such activity in the area of the First Amendment must be done within the narrow confines of the concept of public order and safety. *Cox v. Louisiana*, 379 U.S. 536, 554–55, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965). The State may regulate these "fundamental" interests under the equal protection clause of the Fourteenth Amendment only when the State can show that such regulation is necessary to achieve a "compelling" State interest. *Dunn v. Blumstein*, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); *Kramer v. Union Free School District*, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969); *NAACP v. Button*, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963).

18. The State has a "compelling" interest in not only averting *actual* impropriety, but also in averting the *appearance* of impropriety on the part of the members of its judiciary. The State obviously has such a compelling interest in maintaining the integrity, and the appearance of integrity, of its judiciary as well. *See, e. g., Friedman v. Court on the Judiciary of New York*, 375 U.S. 10, 84 S.Ct. 70, 11 L.Ed.2d 40 (1963); *Johnson v. Avery*, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969); *Napolitano v. Ward*, 457 F.2d 279 (7th Cir. 1972). Nevertheless, we conclude that the exclusionary measure taken by Louisiana—a flat prohibition of not being able to seek nonjudicial office by members of the judiciary—is not a necessary means, or, in fact, even a reasonably necessary means, to effectuate these compelling State interests. As observed by Justice Marshall, "[S]tatutes affecting constitutional rights must be drawn with 'precision'. *NAACP v. Button*, 371 U.S. 415, 438, 83 S.Ct. 328, 340, 9 L.Ed.2d 405 (1963); *U. S. v. Robel*, 389 U.S. 258, 265, 88 S.Ct. 419, 424, 19 L.Ed.2d 508 (1967)." *Dunn v. Blumstein*, 405 U.S. at 343, 92 S.Ct. at 1003.

19. The Statute and Canon are far too imprecise a means to pursue these "compelling" State interests. The nature of the regulation put forth in the Statute and Canon are unnecessary and ineffective in achieving the articulated objectives of the State. A broad prophylactic prohibition requiring a Judge to resign his position before he becomes a candidate for a nonjudicial office is far too heavy handed a means to achieve judicial integrity and actual propriety as well as the appearance of both. Less heavy handed means exist. Some of those alternatives have been set forth above. Although these proposals were made in the context of an interpretation of Canon 7(A)(3), these alternatives obviously are less restrictive than the provisions of both La. R.S. 42:39 and Canon 7(A)(3) as presently constructed.

20. Assuming that a blanket rule were necessary to achieve compelling State objectives, there has been no demonstration by defendants as to why the prohibitions contained in the Statute and Canon should be directed only to *Judges*. Similar prohibitions directed to the police departments and to firemen have been struck down, respectively, in the cases of *Mancuso v. Taft, supra*, and *Hobbs v. Thompson, supra*, because the "compelling" State interests did not justify the broad, prophylactic measures employed by the State to protect those interests. We must conclude that Judges *qua* Judges are no different from policemen and firemen in this regard. Although the functioning of our system of law depends a great deal upon how the public views the men who operate that system, it is obvious that the trust of the public is not dependent upon how only one part of that system is viewed. It is not necessary to the accomplishment of the "compelling" interests of the State that *only* Judges be prohibited from exercising certain of their fundamental interests and First Amendment rights simply because they are Judges when other components of that system are not. *Mancuso v. Taft, supra; Hobbs v. Thompson, supra.*

21. Since candidates for judicial office are subjected to the same political pressures as candidates for nonjudicial offices, and

since Judges in seeking election or reelection to other judicial offices are immersed in the political process to the same degree as other elected officials seeking nonjudicial office, the Statute and Canon are not means even "reasonably calculated" to achieve the "compelling" State interests. *Williams v. Rhodes, supra; Bullock v. Carter, supra; Mancuso v. Taft, supra*; and *Hobbs v. Thompson, supra.*

22. Permitting Judges to run for nonjudicial offices does not introduce any additional real or apparent threat to the integrity of the judiciary which does not already exist in a political system where most State Judges are required to stand for election or reelection every six years. Because Judges must stand for election more often, the Statute and Canon are not even reasonably calculated to achieve the compelling State interests of promoting integrity and propriety of the judiciary. In addition, the evidence shows that there are no significant differences between a candidate for judicial office, a candidate for reelection to a judicial office, and a candidate for a nonjudicial office. *All* must engage in "politics", such as raising campaign funds and soliciting partisan and nonpartisan political endorsements *before* and during the campaign. *C. F. Williams v. Rhodes, supra; Bullock v. Carter, supra; Mancuso v. Taft, supra*; and *Hobbs v. Thompson, supra.*

23. The Statute and Canon do not articulate any "compelling" reason, other than somehow Judges must be more "pure", or more subject to the *spectre* of seeming, as well as actual, conflicts of interest simply because they are Judges. While the concept that a Judge must avoid soiling his office by soliciting finances and voter support may be a laudable goal, it ignores the harsh realities of the Louisiana system as presently confected. If there is a basis for holding Judges *qua* Judges to such harsh prohibitions, while at the same time *not* holding other elected officials or candidates for election to similar harsh standards, the State has failed to show it. Because of this, the State has not discharged its burden of demonstrating that the means are "necessary" to protect "compelling" State interests. *Dunn v. Blumstein, supra; Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *Harper v. Va. Bd. of Elections*, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1963).

24. The Statute and Canon sweep too far into the area of protected freedoms in that both attempt to regulate the ability of Louisiana Judges to run for local office as well as *national* office. As such, they must also fall under the policies of the "Overbreadth Doctrine". This "Overbreadth Doctrine" is based upon the principle that "a government purpose to control or prevent activities constitutionally subject to State regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms." *Zwickler v. Koota*, 389 U.S. 241, 250, 88 S.Ct. 391, 396, 19 L.Ed.2d 444 (1967); *NAACP v. Alabama ex rel. Flowers*, 377 U.S. 288, 84 S.Ct. 1302, 12 L.Ed.2d 325 (1964). *See* Note, *The First Amendment Overbreadth Doctrine*, 83 Harv.L.Rev. 844 (1970). As is evident from the foregoing analysis, the Statute and Canon sweep too far because they purport to regulate conduct and qualifications which the State cannot constitutionally regulate, namely, the qualifications for *national* office. *See, e. g., Stack v. Adams*, 315 F.Supp. 1295 (N.D.Fla.1970); *C. F. Powell v. McCormick*, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969).

25. Plaintiffs will suffer irreparable injury unless the defendants are enjoined from enforcing the unconstitutional provisions of La.R.S. 42:39 and Canon 7(A)(3) of the Code of Judicial Conduct. Plaintiff Morial will be at a distinct disadvantage *vis-à-vis* other candidates for the office of Mayor of the City of New Orleans in the preparation of his campaign. In addition, the other plaintiffs' "fundamental" rights and First Amendment freedoms will be unduly burdened or perhaps even denied unless the prohibitions of the Statute and Canon are enjoined. The Court finds that the plaintiff would be significantly and irreparably harmed by the prohi-

bitions before a decision on the merits could be reached; that the irreparable harm which plaintiffs will suffer outweighs any possible harm that may accrue to the defendants as they have less drastic means of achieving the "compelling" State interests; that plaintiffs have made out a *prima facie* case which indicates that they would succeed on the merits; and finally, that the public interest would best be served by granting the plaintiff preliminary injunctive relief. *A Quaker Action Group v. Hickel*, 137 U.S.App.D.C. 176, 421 F.2d 1111, 1116 (1969); *Keefe v. Geanakos*, 418 F.2d 359 (1st Cir. 1969); *Henry v. Greenville Airport Comm'n*, 284 F.2d 631 (4th Cir. 1969).