Marion BARRY et al., Plaintiffs,

v.

**DISTRICT OF COLUMBIA BOARD OF ELECTIONS AND ETHICS et al., Defendants,**

**District of Columbia et al., Intervening Defendants.**

Civ. A. No. 78–127.

United States District Court, District of Columbia.

April 14, 1978.

Albert J. Beveridge, III, Andrew E. Mishkin, Herbert O. Reid, Sr., Benny L. Kass, Washington, D. C., for plaintiffs.

Winfred R. Mundle, Gen. Counsel, Board of Elections & Ethics, James C. McKay, Jr., Asst. Corp. Counsel, Washington, D. C., for District of Columbia.

JePhunneh Lawrence, pro se.

## MEMORANDUM

GESELL, District Judge.

Plaintiff Marion Barry is an at-large member of the Council of the District of Columbia seeking election in the fall as Mayor. Together with eight of his supporters, each a registered voter in one of the District's eight wards, he sues for a declaration and injunction voiding § 15(b) of the District of Columbia Election Act, as amended, D.C.Code § 1–1115(b) (Supp. IV 1977), on the grounds that it violates rights guaranteed them under the First and Fifth Amendments. Defendants are the District of Columbia Board of Elections and Ethics and two of its members.[1] Shortly after filing, intervention was sought by, and, following a hearing, granted to the District of Columbia and JePhunneh Lawrence, a candidate for an at-large Council seat in the next election. Both intervenors support the constitutionality of the provision challenged. Cross-motions for summary judgment and oppositions have been filed, and the parties are agreed as to all material facts. After carefully considering the papers and the oral arguments of all sides, the Court has determined that § 15(b) cannot stand.[2]

---

1. A third position on the Board was vacant at the time the suit was filed.

2. Intervenor Lawrence filed a motion to dismiss on grounds that the Court lacks jurisdiction and an application for a temporary restraining order seeking to prevent plaintiff Barry from raising campaign funds prior to resignation. Both were denied from the bench at the hearing held on April 7, 1978.

Defendant Board originally argued that Barry's supporters lacked standing to sue, but this

defense has apparently lapsed. In any event such a claim has been rejected explicitly in *Morial v. Judiciary Commission,* 438 F.Supp. 599, 607 (E.D.La.), *rev'd on other grounds,* 565 F.2d 295 (5th Cir. 1977) (en banc), and implicitly in several Supreme Court cases, including *Storer v. Brown,* 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974), and *American Party v. White,* 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974).

The provision at issue was added to the Election Act in 1973 by the District of Columbia Self-Government and Governmental Reorganization Act, Pub.L.No. 93–198, § 751(10), 87 Stat. 774 (1973), the law granting home rule to the District of Columbia. It provides:

No person who is holding the office of Mayor, Delegate, Chairman or member of the Council, or member of the School Board shall, while holding such office, be eligible as a candidate for any other of such offices in any primary or general election, unless the term of the office which he so holds expires on or prior to the date on which he would be eligible, if elected in such primary or general election, to take the office with respect to which such election is held.

D.C.Code § 1–1115(b) (Supp. IV 1977). This "resign to run" statute has been interpreted by the Board of Elections to require resignation before a nominating petition is filed by an elected official who seeks to run for a different office having a term not coincident with the office then held. Nominating petitions are due approximately four months before the election. Thus an elected official must resign four months before the election and, in effect, abandon his term midstream.[3] In contrast, an elected official whose term has only four months to run is not required to resign if he decides to seek another office. The Corporation Counsel supports this interpretation. The Court defers to the expertise of the Board and sustains its construction as the most reasonable. See Broadrick v. Oklahoma, 413 U.S. 601, 617–18, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973).[4]

The hardship worked by the statute is well illustrated by plaintiff Barry's situation. Of the twenty-six elected positions in the District of Columbia, all but one carry four-year terms. (The Delegate to the United States House of Representatives is elected every two years.) By law, however, the terms do not coincide; they are "staggered" so as to ensure smooth transitions in administration. See D.C.Code §§ 1–291(a), 31–101(b)(2) (1970); id. §§ 1–141(b)(4), –161(b) (Supp. IV 1977). This year, for example, elections will be held for Mayor, Chairman of the Council, Delegate, and six Council members. The remaining seventeen positions, including Barry's, do not expire this year. Therefore, under § 15(b) in order to run for Mayor and for the Democratic nomination for that office, plaintiff will have to resign from office by July 5. Even if he is elected Mayor in the fall, he will have lost six months' salary as a Council member because of forced resignation. If he loses, he will have no opportunity to run, even for Council, until 1980. This phenomenon is immutable. Because both Barry's present seat and the one he seeks are of equal duration, their terms will never coincide, and therefore Barry, and the sixteen other elected officials similarly situated will always have to resign prematurely in order to run for Mayor.

This hardship, plaintiffs claim, denies them important First Amendment rights, including the right to candidacy and to free expression and political association. It also allegedly denies them the equal protection of the laws guaranteed by the Fifth Amendment, see Buckley v. Valeo, 424 U.S. 1, 93, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), because the statute discriminates between two classes of officeholders and between a certain class of officeholders and all non-officeholders. Each claim will be examined in turn.

---

**3.** Under rules recently established by defendant Board, 24 D.C.Reg. 7837 (1978), a candidate will not be declared "eligible" unless § 15(b) has been complied with—i. e., the candidate has resigned from current office. This determination will be made shortly after July 5, 1978, the last day by which all persons who seek election in the September 12, 1978, Democratic primary for the office of Mayor must have filed the requisite nominating petitions with the Board. D.C.Code § 1–1108(i)(2) (Supp. IV 1977). These rules do not, of course, apply to write-in candidates, but given the extreme unlikelihood that any write-in candidate could prevail in a city-wide election, this possibility is ignored.

**4.** Intervenor Lawrence's claim that the statute prohibits campaigning even prior to the nomination deadline is accordingly rejected.

## I.

■ The Court has no difficulty recognizing the First Amendment interests involved, but this begins rather than completes the analysis of the challenged provision's constitutionality, for "[n]either the right to associate nor the right to engage in political activities is absolute." *United States Civil Service Commission (CSC) v. National Association of Letter Carriers (Letter Carriers),* 413 U.S. 548, 567, 93 S.Ct. 2880, 2891, 37 L.Ed.2d 796 (1973). And the government has an interest in the conduct and "the speech of its employees that differs significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). In assessing the statute's validity, the Court is guided by the approach adopted by the Supreme Court in *Letter Carriers* and *Broadrick,* in which the Court sustained against First and Fourteenth Amendment attack broad restrictions on political activity by government employees. Characterized alternatively as a "balancing" test or a "means-end" test, the *Letter Carriers* approach requires a comparison of, on the one hand, the interests of plaintiffs in being free of the challenged regulation with, on the other hand, the governmental interests served by the provision and the "closeness of fit" between these governmental interests and the statutory prohibitions. 413 U.S. at 564–80, 93 S.Ct. 2880; *see Morial v. Judiciary Commission,* 565 F.2d 295, 300–01 (5th Cir. 1977) (en banc). The greater the plaintiffs' interests, the greater need be the government's interest and the closer need be the fit between these ends and the means adopted. The conclusion of the Fifth Circuit in *Morial,* a case involving restrictions on the candidacy for public office of sitting judges, is that *Letter Carriers,* viewed "as a part of the jurisprudence of the First Amendment," supports the constitutionality of "restrictions on the partisan political activity of public employees and officers, where such activity contains substantial non-speech elements" only "if justified by a reasonable necessity  .  .  . to burden those activities to achieve a compelling public objective." *Id.* at 300 (citations omitted).

■ Plaintiff Barry's right to candidacy is an important but not constitutionally "fundamental" right. *See id.* at 301; *Magill v. Lynch,* 560 F.2d 22, 27 (1st Cir. 1977), *cert. denied,* —— U.S. ——, 98 S.Ct. 1236, 55 L.Ed.2d 763 (1978). The statute does not raise an absolute bar to his candidacy, but only imposes conditions upon it. The rights of all plaintiffs to free political expression and association, while substantial, *see generally Williams v. Rhodes,* 393 U.S. 23, 30, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968), are not severely impaired. In his 1976 campaign for his at-large seat on the Council, Barry drew 113,461 votes, twice as many as his nearest competitor and more than all five competitors combined. His constituency is broad-based, and unlike *Bullock v. Carter,* 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972), the effect of the restriction is not to exclude from candidacy representatives of an oppressed or even identifiable class. As in *Letter Carriers,* the provisions do not serve "to control political opinions or beliefs, or to interfere or influence anyone's vote at the polls." 413 U.S. at 564, 93 S.Ct. at 2890. Plaintiffs' rights are impaired, but not to an extent warranting "strict" constitutional scrutiny. *Compare Bullock v. Carter,* 405 U.S. at 143–44, 92 S.Ct. 849 *with CSC v. Letter Carriers,* 413 U.S. at 566–67, 93 S.Ct. 2880.[5]

---

5. Both defendants and intervenors argue that since Congress retains full legislative powers over the District and delegated only part of those powers in the Home Rule Act, the constitutional rights plaintiffs claim are somehow less extensive or less important than those enjoyed by citizens of the states, who enjoy a full franchise. This argument is rejected. That the offices in question were only recently made elective in no way diminishes the importance of rights associated with seeking those offices. Although Congress was not constitutionally required to grant self-government to the District, having done so it may not impose unconstitutional conditions or unnecessarily burden the First Amendment rights inherent in democratic self-government. *Cf. Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600

In *Letter Carriers, Broadrick, Morial,* and *Magill* the courts found impairments similar to those here to be outweighed by the countervailing governmental interests advanced by the challenged statute. Those cases involved statutory provisions of long standing and widespread acceptance, both of which naturally suggest strong, rational, and legitimate governmental interests. In this regard the present case parts company with its predecessors.

■ The District of Columbia has enjoyed the franchise for less than four years, and its political leadership is nascent. The provision in question not only deprives Barry and his supporters of protected rights, but also threatens the full and free political participation of a substantial number of leading elected officials. It is difficult to understand what public purpose, if any, is served by this damper on the vigor and vitality of elections for the District's highest offices. Absent a statement by Congress, wholly lacking in this case, of some reason for the provision, the Court is naturally hesitant to accept hypothetical rationalizations for what is an anomaly in state election laws throughout the nation.

According to counsel, the interests sought to be promoted are three: avoiding the cost of separate special elections,[6] maximizing continuity in office, and encouraging devotion to duty. The first has been specifically held by the Supreme Court not to constitute a governmental interest sufficient to ward off constitutional attack. The latter two, although legitimate governmental interests, are not promoted by the provision in question.

Defendants argue that requiring Barry's resignation four months before election day allows them to schedule the special election for his prematurely vacated seat at the same time as the general election, thus minimizing the cost of a separate special election. In *Bullock v. Carter,* 405 U.S. at 147–48, 92 S.Ct. 849 and *Craig v. Boren,* 429 U.S. 190, 198, 97 S.Ct. 451, 50 L.Ed.2d 397 (1977), however, the Supreme Court rejected the notion that considerations of cost and administrative ease can justify governmental restrictions on constitutionally protected activities. Moreover, the number of separate special elections that would actually be avoided is open to serious question. Absent the challenged provision, a special election would be required only when a mid-term officeholder *won* another election. Moreover, nothing in the statutory scheme prevents Barry, even after resigning, from running for both his former seat and the mayoralty at the same time,[7] and if he wins both, a special election will still be required.

The other interests simply are not promoted by the statute. Rather than maximizing continuity in office, the statute discourages it by requiring all elected officials whose terms are not expiring to resign substantially prior to election, even though their campaigns may not be successful and a substantial period remains in their current terms. Absent the statute, mid-term officeholders would serve until such time as they are elected to the other office, and only if and when that occurred would a vacancy arise. Devotion to duty is also promoted only minimally, if at all. In anomalous fashion, the statute, as interpreted by defendants, permits campaigning except during the four months prior to the mid-term election. Prospective mid-term candidates may campaign in disregard of other duties prior to the nomination dead-

---

(1969) (welfare benefits, while not constitutionally required, may not be administered in manner restricting other constitutional rights).

**6.** The additional argument advanced by intervenor District of Columbia that an additional cost of a special election is that it would somehow produce "a less representative elected official" is unsupported and dismissed as frivolous.

**7.** D.C.Code § 1–1115(a) (Supp. IV 1977), prohibits by its terms only simultaneous candidacies for more than one office on the Board of Education or the Council and thus would not bar plaintiff Barry from seeking both the mayoralty and his own seat in the fall.

line to "test the waters" and establish support.

Continuity and devotion to duty are promoted only to the extent that the statute may deter officeholders from running in the middle of their terms. The deterrent effect, however, is speculative at best and is belied by Barry's own determination to run regardless of the decision in this case. Moreover, any deterrent effect that does exist operates against the public interest by reducing the pool of best-qualified candidates available to run for the District's highest offices. With seventeen of the city's twenty-six elected officials constrained this year by the challenged provision, such a reduction cannot be termed *de minimus.*

Even if the statute could be said to advance important governmental interests, it has not been narrowly drawn to do so. To cite one example, none of the supposed governmental interests would be jeopardized, and the infringement on plaintiffs' rights would be lessened, if the statute, while continuing to require announcement of resignation four months prior to election, deferred the effective date of resignation until someone had been elected to fill the position. This is the scheme employed by Florida, the only state with a provision resembling the one in question.[8] Plaintiffs' rights are not fundamental and are certainly subject to regulation by a statute "reasonably necessary to achieve a compelling public objective." But in this case the individual rights must be declared paramount because the broad-gauge statute in question has not been shown to promote *any* cognizable objective.

## II.

Plaintiffs also claim the statute denies them the equal protection of the laws guaranteed by the Fifth Amendment because it discriminates against plaintiff Barry, who, unlike some other Council members and officeholders and the entire public at large, can never run for Mayor, or, for that matter, for Chairman of the Council, without paying a stiff penalty. The penalty is not only a shrinking of First Amendment rights, but a shrinking of the pocketbook as well. By forcing early resignation, the statute requires Barry to forego six months' salary—even if he wins the election. This is a substantial penalty which impacts more severely—perhaps preclusively—on those officeholders of slight wealth. *Cf. Lubin v. Panish,* 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974).

**8.** The Florida statute, Fla.Stat.Ann. § 99.012(2), (3) (West 1973), provides:

(2) No individual may qualify as a candidate for public office who holds another elective or appointive office, whether state, county or municipal, the term of which or any part thereof runs concurrent to the term of office for which he seeks to qualify without resigning from such office not less than ten (10) days prior to the first day of qualifying for the office he intends to seek. Said resignation shall be effective not later than the date upon which he would assume office, if elected to the office to which he seeks to qualify, or the expiration date of the term of the office which he presently holds, or the general election day at which his successor is elected, whichever occurs earlier. With regard to elective offices, said resignation shall create a vacancy in said office thereby permitting persons to qualify as candidates for nomination and election to that office, in the same manner as if the term of such public officer were otherwise scheduled to expire; or, in regard to elective municipal or home rule charter county offices, said resignation shall create a vacancy which may be filled for the unexpired term of the resigned officer in such manner as provided in the municipal or county charter. This does not apply to political party offices.

(3) Any incumbent public officer whose term of office or any part thereof runs concurrent to the term of office for which he seeks to qualify and who desires to resign his office pursuant to the provisions of this act shall execute an instrument in writing directed to the governor, irrevocably resigning from the office he currently occupies. The resignation shall be presented to the governor with a copy to the department of state. The resignation shall become effective and shall have the effect of creating a vacancy in office as provided herein, and the public officer shall continue to serve until his successor is elected or the vacancy otherwise filled as provided above in subsection (2).

The parties agree that the appropriate standard of scrutiny to be applied is the same as that applied to the underlying First Amendment claim, *see Morial v. Judiciary Commission,* 565 F.2d at 304, and the issue is thus whether the distinction drawn between the classes created "serve[s] important governmental objectives" and is "substantially related to achievement of those objectives." *Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 457, 50 L.Ed.2d 397 (1977). The analysis will be served by examining only one of the classifications created and asking the initial question: What governmental objective is served by creating two classes of elected city officials? The parties suggest none, and the only conclusion to be drawn by examining the whole election scheme and what legislative history there is is that none exists. The discrimination wrought is a product of the haphazard interaction of two independent provisions: on the one hand the provisions establishing staggered terms for elected officials, which serve to promote continuity; and on the other hand, § 15(b), which, as noted above, serves no cognizable interest. Without both of these provisions, no discrimination would exist. Since the classification produced is haphazard, it is easy enough to say that the discrimination it works is irrational and thus violative of the equal protection guarantee. Actually, the two provisions in tandem work against the governmental interest in continuity because members of the class discriminated against, like Barry, are encouraged to resign in mid-term. The discrimination is thus at odds with the beneficial purpose of the staggering provisions. Needless to say, no important governmental objective is served by discriminating between the two classes of officeholders, and therefore § 15(b) fails under the Fifth as well as the First Amendment.

## III.

■ There remains the question of severability. Defendant Board of Elections argues that § 15(b) is an integral part of the entire Election Act and thus cannot be struck down without voiding the entire Act. The Court does not agree. The applicable rule was established by the Supreme Court in *Champlin Refining Co. v. Corporation Commission,* 286 U.S. 210, 234, 52 S.Ct. 559, 565, 76 L.Ed. 1062 (1932):

> The unconstitutionality of a part of an Act does not necessarily defeat or affect the validity of its remaining provisions. Unless it is evident that the legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law.

This rule retains full validity. *See Buckley v. Valeo,* 424 U.S. 1, 108, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). In this instance neither the language of the Act nor its legislative history suggest a congressional intent that the Election Act stand or fall as a whole, and the election scheme established will work perfectly well without § 15(b), which in any event was added by amendment several years after passage of the original Act. The effect of the ruling of unconstitutionality does not extend beyond the challenged provision.[9]

Section 15(b) serves no reasonably necessary relation to the achievement of any compelling or important governmental objective. Given the election system in the District of Columbia, Congress may not, consonant with the First and Fifth Amendments, require an elected official in the District to leave office prior to qualifying as an eligible candidate for election to a

---

9. *Dulcan v. Martin,* 64 F.R.D. 327 (D.D.C.1974) (three-judge court), does not require a contrary result. Contrary to the representations of defendant Board, that case did not hold the provisions of the election law nonseverable. Citing *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), and relying on the equitable doctrine of laches, the court refused to declare certain provisions of the law unconstitutional because plaintiffs had waited until the eve of the District's "first self-government election in 100 years" to raise their constitutional attack. Any dicta questioning the severability of the Act is specifically rejected in light of the application of the clear rule of law enumerated by the Supreme Court in *Champlin Refining.*

noncoterminous office. Beyond this, the decision reached herein does not speak. The rights claimed by plaintiffs are not immutable, as *Letter Carriers* and its progeny indicate, and Congress is free to devise other means of implementing the objectives erroneously ascribed to § 15(b). Summary judgment is granted plaintiffs and denied defendants and intervenors.

An appeal in this case is certain, and it is highly desirable that the matter be resolved prior to July 1, 1978. The Court therefore suggests that the parties seek, and respectfully recommends that the Court of Appeals grant, expedited consideration.