Wayne B. WOODWARD,
Plaintiff-Appellee,

v.

CITY OF DEERFIELD BEACH, a
Municipal Corporation of the State
of Florida, Defendant-Appellant.

No. 75–1510.

United States Court of Appeals,
Fifth Circuit.

Sept. 15, 1976.

James G. Kincaid, Ft. Lauderdale, Fla.,
for defendant-appellant.

Steven Squire, Ft. Lauderdale, Fla., for
plaintiff-appellee.

Before WISDOM and MORGAN, Circuit
Judges, and LYNNE, District Judge.

LEWIS R. MORGAN, Circuit Judge:

Plaintiff Wayne B. Woodward sought a
place on the ballot for election to the office
of City Commissioner in Deerfield Beach,
Florida. The city excluded Woodward from
the ballot because he did not meet the re-
quirements of the city's charter that candi-
dates for that office be freeholders and
residents for six months prior to the elec-
tion. Woodward then filed this action in
the Southern District of Florida to enjoin
enforcement of those two charter provi-
sions, on grounds that they unconstitution-
ally deny him equal protection of the law.
The court held for the plaintiff, enjoining
the city from omitting his name from the
ballot. The city appeals.

The city of Deerfield Beach, like other
Florida coastal cities, has undergone con-
siderable growth in the last thirty years.
According to census figures the population
grew from 2,088 in 1950 to 9,573 in 1960 to
17,130 in 1970. Deerfield Beach's city plan-
ners place the population at 25,715, as of
July 1, 1974. The planners project that,
given current zoning restrictions and
growth trends, the city would reach a popu-
lation level of approximately 80,864. In

addition to rapid growth, the city has experienced considerable development as a "winter home community." Estimates of the number of part-year residents vary from 10% to 25%. Deerfield Beach argues that in a city of this nature, candidate qualification requirements such as those involved in this case are necessary to guarantee the election of responsible, knowledgeable city commissioners.

## I.

The beginning, and in most cases ending, point for discussion of freeholder candidacy requirements is *Turner v. Fouche*, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970). In that case the Supreme Court ruled that restricting school board membership in Taliaferro County, Georgia, to freeholders was unconstitutional "even when measured by the traditional test for a denial of equal protection: whether the challenged classification rests on grounds wholly irrelevant to the achievement of a valid state objective."[1] The Court considered and rejected essentially the same justifications put forth by Deerfield Beach in this case: that a school board member would participate responsibly in educational decisions only if he owned real property.

The Court rejected the argument that only taxpayers will act responsibly by pointing out that a resident who rents his home effectively pays the property taxes of his lessor as part of his rent.

Nor does the lack of ownership of realty establish a lack of attachment to the community and its educational values. However reasonable the assumption that those who own realty do possess such an attachment, Georgia may not rationally presume that that quality is necessarily wanting in all citizens of the county whose estates are less than freehold. Whatever objectives Georgia seeks to obtain by its 'freeholder' requirement must be secured, in this instance at least, by means more finely tailored to achieve the

1. *Turner v. Fouche*, 396 U.S. 346, 362, 90 S.Ct. 532, 541, 24 L.Ed.2d 567. The parties have discussed at length the proper test to be applied to equal protection cases involving candidates. The Supreme Court cases in this field have used a broad range of semantic formulas, although some like *Turner v. Fouche* have not reached the issue. *Williams v. Rhodes*, 393 U.S. 23, 30–34, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968) utilized compelling state interest language to strike down ballot access requirements as applied to the American Independent Party, but refused to grant the Socialist Worker's Party relief from the same requirement. In *Jenness v. Fortson*, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971) the Court did not specify the standard being applied. It did, however, arguably utilize a balancing test when it considered the burdens on the candidates and the interests of the state before upholding certain ballot access requirements.

The following year in *Bullock v. Carter*, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972), the Court indicated that barriers to ballot access must be assessed for their impact on voters to determine if the laws should be subjected to "close scrutiny." Determining that close scrutiny was the appropriate standard, the Court struck down the challenged access requirements in light of the availability of alternative means for accomplishing the state interests. *Id.* at 146–47, 92 S.Ct. 849.

Finally, the Court applied differing standards in the companion cases of *Lubin v. Panish*, 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974); *Storer v. Brown*, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974); and *American Party v. White*, 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974). In *Lubin*, Justice Burger used "reasonably necessary" language and reference to alternative means while striking down certain candidate requirements. In *Storer* and *American Party*, Justice White applied a "strict scrutiny" test while upholding candidate requirements because those requirements were justified by "compelling state interests."

Given the great variety of tests suggested by these cases, many lawyers and lower courts have found themselves unable to emerge from this bramblebush unscathed. Probably the best formulation is to recognize that these cases, as a group, call for a balancing test. A court should consider the burdens on candidates and voters, the interests of the state, and possible alternative means for satisfying those interests. *Cf.* Developments in the Law—Election Law, 88 Harv.L.Rev. 1111, 1141–42 (1975) [hereinafter cited as Election Law]. The various tests and code words presented by the Supreme Court could be viewed as guidelines, suggesting the Court's evaluation of the weight of the burden in a particular case.

It is, however, unnecessary in this case to adopt the above proposed test or to adhere to a more traditional test, because the Supreme Court has reached decisions so nearly on point that we are bound to follow their results rather than to work from their reasoning.

desired goal. Without excluding the possibility that other circumstances might present themselves in which a property qualification for office-holding could survive constitutional scrutiny, we cannot say, on the record before us, that the present freeholder requirement for membership on the county board of education amounts to anything more than invidious discrimination. (Footnotes omitted.) [2]

Deerfield Beach argues that *Turner v. Fouche* should be distinguished as a "race" case or alternatively that the situation presented by Deerfield Beach should be considered one of the "other circumstances" alluded to by the Supreme Court in which a freeholder requirement could be upheld. We reject this argument. The logic of *Turner v. Fouche* is just as applicable to Deerfield Beach's freeholder requirement as it was to Taliaferro County's freeholder requirement. That *Turner v. Fouche* was a "race" case was irrelevant to the portion of the opinion dealing with the freeholder requirement, because in that portion of the opinion the Court applied a rational basis test and concerned itself with wealth discrimination, not racial discrimination. Deerfield Beach, like Taliaferro County, cannot presume that all citizens of the city "whose estates are less than freehold" will lack sufficient attachment to the community and responsibility in decision-making.

We believe that the "other circumstances" provided for by the Supreme Court does not refer to other types of communities, but to other types of public office. Offices of general governmental responsibility can never be limited to freeholders. The exceptions, if any, must be limited to special purpose governments whose impact are limited to real property interests. *See, Salyer Land Co. v. Tulare Water District,* 410 U.S. 719, 93 S.Ct. 1224, 35 L.Ed.2d 659 (1973); *Associated Enterprises, Inc., v. Toltec Watershed Improvement District,* 410 U.S. 743, 93 S.Ct. 1237, 35 L.Ed.2d 675 (1973).

Limiting at any level the rights of members of the community to participate in the political process because of their economic station in life offends our most basic understanding of the nature of our government and society. Despite the historic presence of freeholder requirements,[3] the promise of the Declaration of Independence "that all men are created equal" and that "Governments are instituted among Men, deriving their just powers from the consent of the governed," requires that all members of the political community be considered political equals. "[R]epresentative government is in essence self-government through the medium of elected representatives of the people, and each and every citizen has an inalienable right to full and effective participation in the political processes . . . . "[4]

## II.

Unlike freeholder requirements, durational residency requirements cannot be easily dismissed.[5] As the city points out, such requirements can be defended as necessary to insure voter knowledge of the candidate and candidate knowledge of the issues and problems of the area.[6] Mr. Woodward attacks the logic of these requirements, arguing that there is no reason to presume that

2. *Id.* at 364, 90 S.Ct. at 542. *See also,* Elections Law, *supra* at 1220–23.

3. *Harper v. Virginia State Board of Elections,* 383 U.S. 663, 684–85, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (Harlan, J., dissenting).

4. *Reynolds v. Sims,* 377 U.S. 533, 565, 84 S.Ct. 1362, 1383, 12 L.Ed.2d 506 (1964). *Cf.* Comment, Political Gerrymandering: A Statutory Compactness Standard as an Antidote for Judicial Impotence, 41 U.Chi.L.Rev. 398, 399–401 (1974). *See also,* Karst, Equality as a Central Principle in the First Amendment, 43 U.Chi.L. Rev. 20, 52–65 (1975).

5. *See generally,* Election Law, at 1225–30; Comment, Durational Residence Requirements for Candidates, 40 U.Chi.L.Rev. 357 (1973) [hereinafter cited as Durational Residence Requirements].

6. Durational residence requirements are quite prevalent. *See,* Election Law, *supra* at 1225–27 n.38; Durational Residence Requirements, at 382 (1973).

six months residence in a community would insure better knowledge of the problems or better voter knowledge of the candidate, and that the voters should be the ones to decide the qualifications of the candidate and to determine whether they feel confident that they know him.[7]

██ However persuasive Mr. Woodward's line of argument may be, we believe it is precluded by certain provisions in the Constitution and by the Supreme Court. It is certainly difficult to argue, as Woodward has here, that all durational residency requirements are unconstitutional when the Constitution itself has provided that members of the House of Representatives must be residents of the United States for seven years,[8] Senators must be residents of the United States for nine years,[9] and the President must be a resident of the United States for fourteen years.[10] Moreover, in *Chimento v. Stark*, 353 F.Supp. 1211 (D.N. H.), aff'd mem., 414 U.S. 802, 94 S.Ct. 125, 38 L.Ed.2d 39 (1973), the Supreme Court upheld a seven-year durational residence requirement for gubernatorial candidates in New Hampshire. Two years later in *Sununu v. Stark*, 383 F.Supp. 1287 (D.N.H.1974), aff'd mem., 420 U.S. 958, 95 S.Ct. 1346, 43 L.Ed.2d 434 (1975), the Supreme Court affirmed a three-judge decision rejecting an equal protection challenge to a seven-year durational residence requirement for the office of state senator. In light of the inclusion of residency requirements in the Constitution and the recent Supreme Court decision upholding the constitutionality of a seven-year durational residence requirement for the office of state senator, we cannot find a durational residency requirement of six months for the office of city commissioner to be a violation of the equal protection clause of the Fourteenth Amendment.

Accordingly, we AFFIRM the decision of the district court striking down the freeholder requirement as unconstitutional but REVERSE the district court's ruling that the durational residency requirement is unconstitutional.

---

7. *See* Durational Residence Requirements, at 378–79.

8. U.S.Const., art. I, § 2.

9. U.S.Const., art. I, § 3.

10. U.S.Const., art. II, § 1.