**Ernest N. MORIAL et al.,
Plaintiffs-Appellees,**

v.

**JUDICIARY COMMISSION OF the
STATE OF LOUISIANA et al.,
Defendants-Appellants.**

**No. 77–1491.**

United States Court of Appeals,
Fifth Circuit.

Dec. 13, 1977.

Donald Ensenat, Ronald Davis, Staff Atty., M. Truman Woodward, Jr., W. Richard House, Jr., New Orleans, La., for defendants-appellants.

R. James Kellogg, David Marcello, New Orleans, La., for amicus curiae.

Allan Ashman, Asst. Exec. Director, American Judicature Society, Chicago, Ill., for amicus curiae.

Trevor G. Bryan, William J. Jefferson, Sidney M. Bach, New Orleans, La., for plaintiffs-appellees.

Before BROWN, Chief Judge, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, MORGAN, CLARK, RONEY, GEE, TJOFLAT, HILL, FAY and RUBIN, Circuit Judges.

GOLDBERG, Circuit Judge:

In this appeal, we are asked to rule upon the constitutionality of a Louisiana statute and canon of judicial ethics which have the effect of requiring a judge to resign his seat on the bench in order to run for elective non-judicial office. The issue is one which implicates important interests in political participation and equally important ones in the impartial administration of justice. Upon full consideration of the very difficult and perplexing questions presented, we conclude that the challenged statute and canon are constitutional and, therefore, reverse the district court.

## FACTS

Plaintiff Morial is a judge of the Court of Appeal, Fourth Circuit, State of Louisiana. Judge Morial was interested in becoming a non-party candidate for the office of the Mayor of New Orleans. By letter of October 16, 1976, he requested that the Supreme Court of Louisiana grant him a leave of absence, without pay, from his judicial duties in order that he might conduct a campaign for the mayoralty. Morial's request was made in view of Canon 7(A)(3) of the Louisiana Code of Judicial Ethics which provides:

> A judge should resign his office when he becomes a candidate either in a party primary or in a general election for a non-judicial office, except that he may continue to hold his judicial office while being a candidate for election to or serving as a delegate in a state constitutional convention, if he is otherwise permitted by law to do so.[1]

The Louisiana Supreme Court unanimously denied Morial's request for a leave of absence. He then addressed a letter to that court's Committee on Judicial Ethics requesting an advisory opinion on the permissibility of engaging in activities to solicit support for his contemplated campaign.[2] The Committee was unanimously of the view that such activity was prohibited and that Judge Morial would be required to resign before announcing his candidacy.

Judge Morial, joined by thirteen citizen-voters who indicated their support for his candidacy, then brought suit in federal district court seeking a declaration that Canon 7(A)(3) was unconstitutional and enjoining its enforcement. Named as defendants were the Judiciary Commission of the State of Louisiana, its members, the Louisiana Supreme Court, and its members. The plaintiffs also sought a declaration that Louisiana R.S. 42:39, which prohibits any judge, save a justice of the peace, from qualifying for election to any non-judicial office unless he had resigned not less than twenty-four hours prior to the qualifying date, La.Rev.Stat.Ann. § 42:39 (Pocket Part 1977), was unconstitutional and prayed for an injunction against its enforcement. The Governor, Attorney General and Secretary of State of Louisiana in their individual and official capacities were named as defendants in view of their obligation to enforce the "resign-to-run" statute.

The district court granted the plaintiffs' prayer for relief. Judge Cassibry, in a scholarly and penetrating opinion, 438 F.Supp. 599, found that the canon and statute created a "chilling" and inhibitory effect upon the exercise of the plaintiffs' rights of freedom of speech and freedom of association guaranteed by the First Amendment of the United States Constitution. The court concluded that the prohibition of judicial candidacies for non-judicial offices was "not a necessary means, or in fact, even a reasonably necessary means, to effectuate" the admittedly compelling state interest in maintaining the integrity of the judiciary. On these premises, the district court held that the canon and statute violated the first amendment and the equal protection clause of the fourteenth.[3]

---

1. La.Code of Judicial Conduct Canon No. 7(A)(3) (1975). The Louisiana canon is identical to that recommended by the American Bar Association, see ABA Code of Judicial Ethics Canon No. 7(A)(3) (1973), and a similar provision is in force in many states. Appendix I contains a list of such states.

 The analogous federal code contains a similar prohibition. Code of Judicial Conduct for United States Judges Canon No. 7(A)(2) (1973).

2. The Committee is established and given the authority to render advisory opinions by the Code itself. La.Code of Judicial Ethics Committee on Judicial Conduct (1975).

3. Although oral argument in this case was heard by a three-judge panel of this court, on November 3, 1977 it was determined to decide this case en banc. In the order granting defendants' motion for en banc consideration, the en banc court, Judge Fay dissenting, voted to stay the order of the district court pending further order of this court.

 Subsequent to the entry of this order but prior to the election held November 12, plaintiff Morial resigned his judgeship. Just prior to and subsequent to the general election, several candidates in the primary and general elections brought suit in state court challenging Morial's right to run. The Louisiana intermediate appellate court held, apparently as a matter of

## JURISDICTION

 Defendants urge that the district court should have dismissed this suit for lack of subject matter jurisdiction. They assert that any threat to the plaintiffs' interests was purely hypothetical and speculative when the complaint was filed and thus did not give rise to a justiciable case or controversy. We cannot agree. The court's power to adjudicate a case arising under 42 U.S.C. § 1983, pursuant to jurisdiction conferred by 28 U.S.C. § 1343(3) and 28 U.S.C. §§ 2201–2202, is not conditioned upon a plaintiff's actually proceeding to violate some assertedly unconstitutional state law prior to bringing suit in federal court. Pre-conduct challenges to the validity of laws burdening first amendment rights are among the essential bulwarks of a system of free expression. *See Doran v. Salem Inn, Inc.,* 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975); *Steffel v. Thompson,* 415 U.S. 452, 462, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974); *Dombrowski v. Pfister,* 380 U.S. 479, 490, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). While courts have an interest in having concrete factual situations presented for judicial consideration, this interest would not be advanced by withholding anticipatory relief where, as here, the course of conduct in which the plaintiff plans to engage is clear to the court at the time the suit is filed. Indeed, in the case at bar, just as in *Steffel,* the plaintiff outlined his anticipated course of conduct with sufficient clarity to the state enforcement authorities to enable them to determine that his conduct would violate the state rule and expose him to

state law, that Morial had properly qualified as a candidate in view of the fact that the operation of the statute which would have barred his candidacy was suspended by the order of the district court in this case. (We have no occasion to consider in this case whether, as a matter of federal law, Louisiana would have been required to give this effect to the district court's order.) By denial of writs in these suits, the Louisiana Supreme Court affirmed that plaintiff Morial was validly a candidate for election. On November 12, 1977, Morial was elected Mayor of New Orleans.

The parties to this suit agree that the case is not moot notwithstanding these events. We concur. Suits challenging the validity of state election laws are classic examples of cases in which the issues are "capable of repetition, yet evading review." The Supreme Court has decided a number of such cases after the challenged election had already taken place and no request for retrospective relief could be granted. *American Party of Texas v. White,* 415 U.S. 767, 770 n. 1, 94 S.Ct. 1296, 1301 n. 1, 39 L.Ed.2d 744, n. 1 (1974); *Storer v. Brown,* 415 U.S. 724, 737 n. 8, 94 S.Ct. 1274, 1282 n. 8, 39 L.Ed.2d 714 (1974); *Moore v. Ogilvie,* 394 U.S. 814, 816, 89 S.Ct. 1493, 1494, 23 L.Ed.2d 1 (1969). In none of these cases was the suit brought as a formal class action; nor did the Court pause to consider whether the particular plaintiff would be subject to future harm. In language directly applicable to this case, the *Storer* Court wrote,

> The 1972 election is long over, and no effective relief can be provided to the candidates or voters, but this case is not moot, since the issues properly presented, and their effects on independent candidacies, will persist as the California statutes are applied in future elections. This is, therefore, a case where the controversy is 'capable of repetition yet evading review.'

*Storer v. Brown, supra,* 415 U.S. at 737 n. 8, 94 S.Ct. at 1282 n. 8; *Cf. Magill v. Lynch,* No. 76–1532, 560 F.2d 22, at 25 n. 1 (1st Cir. 1977) (election case decided after election not moot on a different theory). The effects of the Louisiana statute on judicial candidacies, too, will persist as it is applied in future elections.

While at one time it seemed that the *Storer* approach had been cast aside by the Court in *Sosna v. Iowa,* 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975), *see Henderson v. Fort Worth Independent School District,* 526 F.2d 286, 288–89 n. 1 (5th Cir. 1976), a case decided last term demonstrates that *Storer* retains full vitality. In *Mandel v. Bradley,* 432 U.S. 173, 97 S.Ct. 2238, 53 L.Ed.2d 199 (1977) (per curiam), the Court held, citing *Storer,* that a challenge to a Maryland candidate qualification requirement was not moot notwithstanding the fact that the plaintiff had, while under the protection of a district court injunction, "successfully gathered the requisite number of signatures, obtained a place on the ballot, ran and lost" prior to the Court's decision. *Id.,* 432 U.S. at 175, 97 S.Ct. at 2239 n. 1. *Mandel* was not brought as a class action. We believe that this pronouncement of the Supreme Court in a case so very closely analogous to that at bar must govern. The pace of reasoned constitutional adjudication, these cases show, is not parametric with that of election campaigns. *But cf. DeFunis v. Odegaard,* 416 U.S. 312, 317, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974) (future suits challenging university admissions program would not evade review because state court's holding in instant case would expedite process of appellate review). *See* Note, *Mootness in the Supreme Court,* 88 Harv.L.Rev. 373, 392–95 (1974).

sanctions. In such circumstances, the threat of punishment for engaging in protected activity cannot be characterized as "imaginary or speculative," *cf. Younger v. Harris,* 401 U.S. 37, 41, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

 Defendants also urge that principles of comity and federalism bar a federal court from entertaining a claim by a member of a state's judiciary regarding a question of judicial administration. *Younger* principles, even were we to assume them applicable to disciplinary proceedings against a judge, *see generally, Juidice v. Vail,* 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977); *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975), have no application where state proceedings have not been initiated prior to substantial proceedings on the merits in federal court. *Hicks v. Miranda,* 422 U.S. 332, 349, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975). *Younger* principles are not invoked by the mere fact that federal relief has an impact upon state governmental machinery; even in its quasi-criminal extensions, *Younger* dismissal is called for only in those circumstances where successful defense of a state enforcement proceeding, initiated before substantial federal proceedings on the merits had occurred, would fully vindicate the federal plaintiff's federal right. *Younger, supra,* 401 U.S. at 49, 91 S.Ct. 746; *Steffel, supra,* 415 U.S. at 460–61, 94 S.Ct. 1209; *Gibson v. Berryhill,* 411 U.S. 564, 577, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973); *Huffman, supra,* 420 U.S. at 603, 95 S.Ct. 1200; *Juidice, supra,* 430 U.S. at 334, 338, 97 S.Ct. at 1217, 1218. The *Younger* principles simply are not what the defendants would have them be: a broad, discretionary, device for the evasion of the responsibility of federal courts to protect federal rights from invasion by state officials.

I. THE FIRST AMENDMENT CLAIMS[4]

 In judging the constitutional validity of Louisiana's rule that judges resign their offices prior to becoming candidates for non-judicial office, this court must be guided by the approach adopted by the Supreme Court in *U. S. Civil Service Comm'n v. National Ass'n of Letter Carriers,* 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973) and *Broadrick v. Oklahoma,* 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973), the so-called "Hatch Act" cases. In these cases, the Court upheld against constitutional challenge broad restrictions upon the political activity of federal and state civil service employees. 413 U.S. at 556, 93 S.Ct. 2880; 413 U.S. at 616–17, 93 S.Ct. 2908. The Court specifically approved restrictions on the right of a federal civil servant to be "a partisan candidate for . . . an elective public office," *Letter Carriers, supra,* 413 U.S. at 556, 93 S.Ct. at 2886, and on the right of state civil servants to become "candidates for any paid public office . . . ," *Broadrick, supra,* 413 U.S. at 616–17, 93 S.Ct. at 2918. It is evident that the central issue in the resolution of the first amendment claims in the case at bar is the applicability of these conclusions to a sitting judge who intends to run for non-judicial office.

Correct extrapolation of the *Letter Carriers* and *Broadrick* decisions requires careful attention to the Court's analysis. Some lower courts have characterized these cases as employing a "balancing test." *Alderman v. Philadelphia Housing Authority,* 496 F.2d 164, 171 n. 45 (3rd Cir. 1974); *Magill v. Lynch,* No. 76–1532, 560 F.2d 22, at 27 (1st Cir. 1977). To the extent that the term "balancing" implies that the decision in *Letter Carriers* turned entirely on the relative importance the Court ascribed to the governmental interests and those of the employees, we find the word misleading. The analysis was actually more complex. As a first step the Court articulated the interests of the employees in being free of the chal-

---

4. The plaintiffs' claims under the first and fourteenth amendments present substantially identical issues. Nonetheless, we treat the first amendment claim separately from the equal protection claim in order later to highlight more readily certain aspects of the challenged state rule arising out of Louisiana's special treatment of judges seeking election to non-judicial office.

lenged restriction. 413 U.S. at 564–68, 93 S.Ct. 2880. The Court observed that while the Hatch Act admittedly burdened some activity implicating first amendment values, its prohibitions were far from universally applicable in that only certain partisan activity was proscribed. The employees were free to engage in many other forms of political expression. *Id.* at 576, 93 S.Ct. 2880. The Court then articulated each of the important governmental interests in protecting the integrity of its civil service and examined the closeness of fit between these governmental interests and the Hatch Act prohibitions. *Id.* It is this means-end scrutiny which is obscured by incautious description of the *Letter Carriers* approach as a simple "balancing test."

The Court in *Letter Carriers* did not require that the means-end fit be perfect. Rather, it held that Congress could constitutionally restrict political activity by subordinate employees in order to prevent coercion by their superiors; the legislature did not have to rely upon a prohibition against coercion alone, a less restrictive and arguably effective alternative to the measure enacted. *Id.* at 566–67, 93 S.Ct. 2880. On the other hand, it is clear that the Court was not and could not be satisfied with a means-end relation that was merely rational in view of the Hatch Act's impact on first amendment values. *See Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 2684–85, 49 L.Ed.2d 547 (1976); *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 637–38, 46 L.Ed.2d 659 (1976). Indeed, the *Letter Carriers* opinion makes prominent and particular mention of the substantial body of expert opinion, available to Congress at the time it considered the Hatch Act, supporting the

reasonableness of Congress' view that a simple ban on coercion would be ineffective. 413 U.S. at 566–67, 566 n. 12, 93 S.Ct. 2880. Such support would hardly be necessary to sustain a statute if tested against a standard of mere rationality.

The Supreme Court's utilization of different standards of scrutiny in cases involving the first amendment rights of public employees, *compare Letter Carriers, supra* with *Elrod v. Burns, supra* and *Buckley v. Valeo, supra,* can be reconciled only by concluding that the requisite closeness of the means-end relation must be determined on a case-by-case basis. The standard to be applied in any case is a function of the severity of impairment of first amendment interests. As the burden comes closer to impairing core first amendment values, *e. g.* the right to hold particular political views, *Elrod v. Burns, supra,* 427 U.S. at 355, 96 S.Ct. at 2681, or impairs some given first amendment value more substantially, *Buckley v. Valeo, supra,* 424 U.S. at 19–23, 96 S.Ct. at 635–36, the requisite closeness of fit of means and end increases accordingly. The teaching of *Letter Carriers,* considered as a part of the jurisprudence of the first amendment and not some anomalous class of "Hatch Act cases," is that restrictions on the partisan political activity of public employees and officers, where such activity contains substantial non-speech elements, *see United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), are constitutionally permissible if justified by a reasonable necessity, *see Bullock v. Carter,* 405 U.S. 134, 144, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972), to burden those activities to achieve a compelling public objective.[5]

---

**5.** We recognize, of course, that the Supreme Court has not articulated the applicable test in precisely this way. Nonetheless, the Court's reasoning and its holdings in cases closely analogous to that at bar support the appropriateness of a variable standard of scrutiny dependent upon the character and substantiality of the impairment of first amendment interests.

In *Elrod v. Burns, supra,* the Court invalidated an Illinois system of patronage dismissals. The plurality insisted that the state employ the least intrusive means of achieving its objective. 427 U.S. at 361–365, 96 S.Ct. at 2684–85. In

contrast, the *Letter Carriers* majority used some less exacting standard. *U. S. C. S. C. v. National Ass'n of Letter Carriers,* 413 U.S. 548, 596–99, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973) (Douglas, J., dissenting). In *Buckley v. Valeo, supra,* the per curiam portion of the decision, using a single form of words to describe the test, reaches different results on the constitutionality of the federal limit on campaign contributions and campaign expenditures, 424 U.S. 1, 96 S.Ct. 612, 640, 647, 46 L.Ed.2d 659 (1976), a difference premised largely upon the "markedly greater burden on basic freedoms" im-

## A. The Plaintiffs' Interests

Our analysis of the impact of the Louisiana rule upon the first amendment interests of the plaintiffs convinces us that the reasonable necessity standard extracted from *Letter Carriers* is appropriate in this case. We begin that analysis by detailing the affected interests, noting that the arithmetic of constitutional adjudication of restrictions upon candidacy requires the court to sum the affected interests of plaintiff Morial and the plaintiffs who would support him but for the canon's bar. *Bullock v. Carter,* 405 U.S. 134, 142–44, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972). As to the former, we are enjoined to recall that the Supreme Court has not declared a right to candidacy fundamental, *id.* at 143, 92 S.Ct. 849; *see Magill v. Lynch, supra,* (disapproving *Mancuso v. Taft,* 476 F.2d 187 (1st Cir. 1973)). As to the latter, "it is essential to examine in a realistic light the extent and nature" of the Louisiana rule's impact upon voters. *Bullock v. Carter,* 405 U.S., at 143, 92 S.Ct., at 856.

Judge Morial's interest in being free to run for Mayor while retaining his seat on the bench is substantial. The canon and statute heavily burden a decision to become an active candidate for non-judicial office by forcing a judge to resign a remunerative position of considerable prestige and power merely in order to run. Relegating one's robes to the closet is a heavy price to pay for tossing one's hat in the ring.

This burden, moreover, weighs upon the exercise of an important, if not constitutionally "fundamental," right. Candidacy for office is one of the ultimate forms of political expression in our society. The citizen deeply committed to the triumph of an idea or program can equally be the citizen devoted to the representation of that idea or the implementation of that program. *See Mancuso v. Taft, supra.*

The first amendment interest of Judge Morial which the Louisiana rules leave unaffected must also be considered, however, in order to judge the substantiality of the impairment. Louisiana's resign-to-run requirement does not burden the plaintiff's right to vote for the candidate of his choice or to make statements regarding his private opinions on public issues outside a campaign context; nor does it penalize his belief in any particular idea. These are core first amendment values. *See U. S. Civil Service Comm'n v. Nat'l Ass'n of Letter Carriers,* 413 U.S. at 556, 575–76, 93 S.Ct. 2880; *Buckley v. Valeo,* 424 U.S., at 19–23, 96 S.Ct., at 635–36; *Elrod v. Burns,* 427 U.S., at 355–359, 96 S.Ct., at 2681–82; *Alderman v. Philadelphia Housing Authority,* 496 F.2d 164 (3rd Cir. 1974), *cert. den.,* 419 U.S. 844, 95 S.Ct. 77, 42 L.Ed.2d 72 (1974). Even in its limited sphere of operation, the Louisiana rule is administered in such a manner as to mitigate somewhat the deterrent effect of the resignation requirement. The letter which informed Judge Morial that Canon 7(A)(3) barred him from active candidacy while still a judge also informed him that the canon did not prohibit preliminary surveys of financial and voter support. In other words, the canon does not require a prospective candidate to balance a secure judgeship against a complete leap in the dark. The prospective candidate need not resign merely to learn whether he has a realistic chance of election.

The impact of the resign-to-run requirement upon voters is even less substantial. Where candidacy restrictions have been invalidated on constitutional grounds the ef-

---

posed by the expenditure limit. *Id.,* 424 U.S. at 44, 96 S.Ct. at 647. In still other cases the Court has employed a means-end test, *see Bates v. State Bar of Arizona,* —— U.S. ——, ———–———, 97 S.Ct. 2691, 2701–07, 53 L.Ed.2d 810 (1977); *Virginia Pharmacy Board v. Virginia Consumer Council,* 425 U.S. 748, 96 S.Ct. 1817, 1828–30, 48 L.Ed.2d 346 (1976), without explicitly articulating the constitutionally requisite closeness of the fit between the state's chosen end and means. Cases dealing with candidacy restrictions based on filing fees, past or present levels of support, and durational residency requirements have also used a variety of standards of scrutiny. See *Woodward v. City of Deerfield Beach,* 538 F.2d 1081, 1082 n. 1 (5th Cir. 1976) for a review of this difficult jurisprudence. The concordance of these discordant canons of constitutional adjudication can best be accomplished, we believe, by the adoption of the approach discussed in the text.

fect of the restriction was to exclude candidates of an identifiable group or viewpoint, e. g., the poor, *Lubin v. Panish,* 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974), *Bullock v. Carter,* 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972), *Turner v. Fouche,* 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970), or minority parties, *Williams v. Rhodes,* 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968). While we would be the last to deny that Louisiana state judges have qualities of talent and experience which make them attractive candidates for non-judicial office, excluding the class of judges cannot be said to have a major impact upon the availability of candidates to represent any particular group or viewpoint. Exclusion of judges from the pool of prospective candidates cannot be supposed to have a qualitatively different effect on the interests of voters than the analogous exclusion of equally talented and experienced federal and state civil servants, an exclusion which the Supreme Court found constitutional in *Letter Carriers* and *Broadrick.*

The impairment of the plaintiffs' interests in free expression and political association stemming from enforcement of the resignation rule is thus not sufficiently grievous to require the strictest constitutional scrutiny. *U. S. Civil Service Comm'n v. Nat'l Ass'n of Letter Carriers,* 413 U.S. 548, 566–67, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973); *Magill v. Lynch,* No. 76–1532, 560 F.2d 22, at 27–28 (1st Cir. 1977). Neither is the impairment insubstantial or innocuous; a level of scrutiny which guarded against only those measures offending logic would be a gratuitous insult to the seriousness of the interests involved in becoming or supporting a candidate for public office. *See Storer v. Brown,* 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974); *Bullock v. Carter,* 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972); *Woodward v. City of Deerfield Beach,* 538 F.2d 1081, 1082 n. 1, 1083 (5th Cir. 1976). Instead, we should employ a level of scrutiny which requires the state to show a reasonable necessity for requiring judges to resign before becoming candi-

dates for elective non-judicial office. *See Lubin v. Panish,* 415 U.S. 709, 718, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974); *Bullock v. Carter,* 405 U.S. 134, 144, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972).

### B. The State's Interests and Their Relation to the Resign-to-Run Rule

Having determined that Louisiana's resign-to-run rule must meet the test of reasonable necessity, we now turn to the articulation of the state's interests to see whether the rule is reasonably necessary to effectuate those interests. Louisiana vigorously defends the resignation requirement as a measure designed to insure the actual and perceived integrity of state judges. The specific evils targeted are three. First, the state wishes to prevent abuse of the judicial office by a judge-candidate during the course of the campaign. The state also wishes to prevent abuse of the judicial office by judges who have lost their electoral bids and returned to the bench. Finally, Louisiana asserts an interest in eliminating even the appearance of impropriety by judges both during and after the campaign.

That these are interests grave and honorable, none can doubt. The government has at least as great an interest in assuring the impartiality of judicial administration of the laws as in assuring the impartiality of bureaucratic administration of the laws. *See U. S. Civil Service Comm'n v. Nat'l Ass'n of Letter Carriers,* 413 U.S. 548, 564–65, 93 S.Ct. 2880, 37 L.Ed.2d 796. As the Supreme Court has observed, the reality and the appearance of "political justice" are incompatible with the assumptions of a system of government of laws not men. *Id.* Ours is an era in which members of the judiciary often are called upon to adjudicate cases squarely presenting hotly contested social or political issues. The state's interest in ensuring that judges be and appear to be neither antagonistic nor beholden to any interest, party, or person is entitled to the greatest respect. *Cf. United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974).[6]

---

**6.** Plaintiffs argue that Louisiana has largely disavowed these interests in insulating judges

from political influence by providing for an elected judiciary. In view of this disavowal,

The resign-to-run rule is reasonably necessary to the state's vindication of these interests. By requiring a judge to resign at the moment that he becomes a candidate, the state insures that the judge will not be in a position to abuse his office during the campaign by using it to promote his candidacy. The appearance of abuse which might enshroud even an upright judge's decisions during the course of a hard-fought election campaign is also dissipated by requiring the judge to resign. He who does not hold the powers of the office cannot abuse them or even be thought to abuse them.

Even clearer is the reasonable necessity of the resignation requirement to the prevention of post-campaign abuse or its appearance. It is apparent that the prevention of post-campaign abuse calls for measures which are effective in the post-campaign period. A leave of absence for the duration of the campaign wholly fails to meet this requirement of post-campaign effectiveness; the state cannot be constitutionally faulted for failing to provide Judge Morial with a leave of absence. Moreover,

the argument continues, Louisiana's interests cannot be of sufficient constitutional weight to overcome the plaintiffs' first amendment rights.

This argument raises questions that are best considered in the context of the equal protection analysis of the Louisiana rule. In effect, plaintiffs attack the permissibility of requiring judges who wish to run for non-judicial office to resign while permitting those who wish to run for judicial office to retain their seats. Framed in this manner, the thrust of plaintiff's argument is directed at the legislative classification, the traditional focal point of equal protection analysis. *See* Part II, *infra.*

We pause, nonetheless, to reject the implied premise of the plaintiffs' argument, i. e., that unless the state exercises the full extent of its power to prevent some evil, the state's interest in preventing that evil cannot be considered constitutionally weighty. To take an obvious example, the Supreme Court in *Buckley v. Valeo* recognized that the government's interest in preventing undue influence upon elected officials was sufficiently important to justify the regulation of campaign contributions, 424 U.S., at 29, 96 S.Ct., at 640, notwithstanding the obvious fact that Congress has never attempted to eradicate every possible source of such influence.

the standard of reasonable necessity does not require the state to place entire reliance upon post-campaign measures such as disciplinary proceedings against judges who used their offices improperly or strict rules of recusal, both of which are designed to target perfectly those situations where the dangers of abuse or its appearance are greatest. As we have shown, the "reasonable necessity" test permits a degree of prophylaxis, particularly where the state has an interest in avoiding the appearance of impropriety. *U. S. Civil Service Comm'n v. Nat'l Ass'n of Letter Carriers,* 413 U.S. 548, 566–67, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973); *see Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 638–39, 46 L.Ed.2d 659 (1976). As a constitutional matter, we cannot say the prophylaxis here is an excess of caution. The common-sense conclusion that the resignation requirement makes a substantial contribution to the achievement of the state's ends is reinforced by the widespread adoption of the canon.[7] Louisiana's canon and statute do not violate the first amendment.[8]

7. See Appendix I.

The Louisiana Code of Judicial Conduct was adopted by the Louisiana Supreme Court pursuant to its rule-making authority under the most recent version of the Louisiana constitution. La.Const. art. V, § 5. The fact that judges adopted a restriction upon judges may also be of constitutional significance. *See* Ely, *The Constitutionality of Reverse Discrimination,* 41 U.Chi.L.Rev. 723, 734–36 (1974).

8. Our conclusion on this issue does not disregard the fact that Judge Morial did not intend to run as a party representative. As the plaintiffs correctly point out, much of the language in *Letter Carriers* pointedly limited the Court's holding to an adjudication of the validity of prohibitions on partisan political activity. 413 U.S., at 556, 93 S.Ct., at 2886. In the context of the Hatch Act which regulates the activities of federal employees, it was natural for the Supreme Court to discuss the dangers of partisanship as if they were substantially identical to the dangers of *party* domination. *Id.* at 564–68, 93 S.Ct. at 2889. We do not believe, however, that the restrictive language of *Letter Carriers* requires courts to ignore the reality of partisanship if the formality of party affiliation is absent. *Magill v. Lynch,* No. 76–1532, 560 F.2d 22 (1st Cir. 1977). A faction may form around a man as much as around a party label;

## II. The Equal Protection Claims

■ The plaintiffs couch their complaint in the language of the equal protection clause of the fourteenth amendment as well as in the language of the first. While it is true that a first amendment claim typically takes the form of an assertion that the government cannot deprive the plaintiff of some freedom and an equal protection claim takes the form of an assertion that the government may not single out the class of which the plaintiff is a member for deprivation, it is equally true that every first amendment claim can be transformed into an equal protection claim merely by focusing upon the classification that every legislative scheme embodies. It is, therefore, generally appropriate to employ the same standard of scrutiny to the derivative equal protection claim as would be applied to the underlying claim of a substantive deprivation.[9] See American Party v. White, 415 U.S. 767, 778, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974); Broadrick v. Oklahoma, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). The method of equal protection analysis, however, retains independent worth even in such cases. Highlighting the legislative classification serves to illumine the state's interest in burdening those of the plaintiff's class and the necessity of doing so in order to advance that interest.

The nub of the equal protection problem in the present case is that judges running for election to non-judicial office are singled out. The state makes two classifications. First, any judge may run for judicial office without resigning his seat on the bench. A classification is thus established between judges who wish to run for judicial office and judges who wish to run for non-judicial office. Moreover, anyone other than a judge may run for non-judicial office without resigning the office he holds at the time he announced his candidacy. A second classification is thus established between judges and all other office holders. The constitutional problem is to determine whether these classifications are reasonably necessary to the vindication of Louisiana's interest in the integrity of its elected judiciary.

The district court made formal findings of fact on the conduct of judicial and non-judicial elections in Louisiana. The most important of these findings were that the conduct of political campaigns for the judicial and non-judicial offices were similar and that, when judges run for re-election or election to another judicial office, they "raise money, engage in political oratory, make campaign promises, appeal to various political and racial groups, advertise in the media, and run under political party labels in the same way as do other candidates running for non-judicial office." (Finding of Fact 21). Newspaper headlines and campaign oratory describe the political affiliations and ideologies of candidates for judicial office. The district court concluded that "viewed against the reality of the full involvement in politics, then there is no rational basis for thus distinguishing between Judges who run for reelection or for a higher judicial office and Judges who run for nonjudicial office." (Finding of Fact 31).

the judicial office may be abused by using it to promote the interest of a faction as well as a formal party. Moreover, the record in this case demonstrates that formal party and political organizations with defined constituencies play a major role in New Orleans mayoralty campaigns, endorsing candidates, distributing sample ballots, and otherwise promoting the election of favored candidates. Thus, the mere fact that plaintiff Morial's name would appear on the ballot without party designation does not render the state powerless to require his resignation from the bench. Id. We do not mean to say that legislatures are necessarily equally free to restrict formally partisan and formally nonpartisan conduct. In any given case, the relevant inquiry must be whether the threat to the state's interests in the impartiality of its public servants stems from party involvement or from political involvement.

9. Of course, if the legislative scheme embodies a classification which is itself constitutionally suspect, strict constitutional scrutiny is required without regard to the nature of underlying deprivation. See, e. g., Graham v. Richardson, 403 U.S. 365, 371–73, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971).

While these findings make this a difficult and troublesome case, we do not think they are determinative of the constitutional issue. The equal protection clause of the constitution does not put the states to the choice of foregoing an elective judiciary or treating candidates for judicial office like candidates for all other elective offices. The Louisiana constitution, like the federal constitution, creates a separate judicial branch. Article V of the Louisiana constitution is devoted entirely to the functions and duties of that branch. The structure, powers, duties, and emoluments of the state's judiciary are treated differently from those of "Public Officials," who are dealt with in a separate article of the constitution, article IX.

Because the judicial office is different in key respects from other offices, the state may regulate its judges with the differences in mind. For example the contours of the judicial function make inappropriate the same kind of particularized pledges of conduct in office that are the very stuff of campaigns for most non-judicial offices. A candidate for the mayoralty can and often should announce his determination to effect some program, to reach a particular result on some question of city policy, or to advance the interests of a particular group. It is expected that his decisions in office may be predetermined by campaign commitment. Not so the candidate for judicial office. He cannot, consistent with the proper exercise of his judicial powers, bind himself to decide particular cases in order to achieve a given programmatic result.[10] Moreover, the judge acts on individual cases and not broad programs. The judge legislates but interstitially; the progress through the law of a particular judge's social and political preferences is, in Mr. Justice Holmes' words, "confined from molar to molecular motions." *Southern Pacific Co. v. Jensen,* 244 U.S. 205, 221, 37 S.Ct. 524, 531, 61 L.Ed. 1086 (1916) (Holmes, J., dissenting).

As one safeguard of the special character of the judicial function, Louisiana's Code of Judicial Conduct bars candidates for judicial office from making "pledges or promises of conduct in office other than the faithful and impartial performance of the duties of the office;" La.Code of Judicial Conduct Canon No. 7(B)(c).[11] Candidates for non-judicial office are not subject to such a ban; in the conduct of his campaign for the mayoralty, an erstwhile judge is more free to make promises of post-campaign conduct with respect both to issues and personnel, whether publicly or privately, than he would be were he a candidate for re-election to his judgeship. The state may reasonably conclude that such pledges and promises, though made in the course of a campaign for non-judicial office, might affect or, even more plausibly, appear to affect the post-election conduct of a judge who had returned to the bench following an electoral defeat. By requiring resignation of any judge who seeks a non-judicial office and leaving campaign conduct unfettered by the restrictions which would be applicable to a sitting judge, Louisiana has drawn a line which protects the state's interests in judicial integrity without sacrificing the equally important interests in robust campaigns for elective office in the executive or legislative branches of government.

This analysis applies equally to the differential treatment of judges and other office holders. A judge who fails in his bid for a

10. The district court recognized that this sketch represents accurately the judicial landscape of Louisiana notwithstanding the regularity of hotly contested judicial elections. Judge Cassibry wrote, "None of these findings should be construed as accusing any State Judge of being politically motivated in any decision he might render. Without exception, I am convinced that they decide their cases freely and impartially based on the law and evidence." (Finding of Fact 30).

11. The district court made no finding explicitly directed to the question of whether this canon is ordinarily observed in the conduct of campaigns for judicial office in Louisiana. Our own review of the exhibits consisting of newspaper articles and advertisements by candidates for judicial office revealed that most such articles and advertisements confined themselves to statements of the educational and professional attainments of the candidates.

post in the state legislature must not use his judgeship to advance the cause of those who supported him in his unsuccessful campaign in the legislature. In contrast, a member of the state legislature who runs for some other office is not expected upon his return to the legislature to abandon his advocacy of the interests which supported him during the course of his unsuccessful campaign. Here, too, Louisiana has drawn a line which rests on the different functions of the judicial and non-judicial office holder.[12]

Nothing in the case law convinces us that this conclusion is incorrect. In fact, such indications as are found reinforce the validity of our analysis. In *Broadrick,* the Supreme Court summarily disposed of the employees' equal protection claim that the Oklahoma statute impermissibly singled out classified civil service employees for restrictions on partisan political expression. The Court stated,

> In any event, the legislature must have some leeway in determining which of its employment positions require restrictions on partisan political activities and which may be left unregulated. *See McGowan v. Maryland,* 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961). And a State can hardly be faulted for attempting to limit the positions upon which such restrictions are placed.

413 U.S. at 607 n. 5, 93 S.Ct. at 2913. Several lower federal courts have rejected equal protection challenges similar to that pressed here. *Perry v. St. Pierre,* 518 F.2d 184 (2d Cir. 1975); *Stack v. Adams,* 315 F.Supp. 1295 (D.Fla.1970); *Deeb v. Adams,*

315 F.Supp. 1299 (D.Fla.1970); *see also Holley v. Adams,* 238 So.2d 401 (Fla.1970).

On principle and precedent, we find the Louisiana canon and statute constitutional. Though the questions presented here are difficult ones, we are confident of the validity of our conclusions.

### Conclusion

The interests of public employees in free expression and political association are unquestionably entitled to the protection of the first and fourteenth amendments. *Mt. Healthy City School Dist. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 574, 50 L.Ed.2d 471 (1977); *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). Nothing in today's decision should be taken to imply that public employees may be prohibited from expressing their private views on controversial topics in a manner that does not interfere with the proper performance of their public duties. *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Hobbs v. Thompson,* 448 F.2d 456 (5th Cir. 1971). In today's decision, there is no blanket approval of restrictions on the right of public employees to become candidates for public office. *See Magill v. Lynch,* No. 76–1532, 560 F.2d 22 (1st Cir. 1977); *see generally Developments in the Law Elections,* 88 Harv.L.Rev. 1111, 1121–50, 1217–33 (1975); Gordon, *The Constitutional Right to Candidacy,* 91 Pol.Sci.Q. 471 (1976). Nor do we approve any general restrictions on the political and civil rights of judges in particular. Our holding is necessarily narrowed by the methodology employed to reach it. A requirement that a

12. It might be argued that Louisiana's interest in protecting the real and apparent integrity of its sitting judges is threatened as much by permitting politically involved persons to run for judicial office as it would be by allowing judges who became politically involved during the course of a campaign for non-judicial office to return to the bench after suffering electoral defeat. A mayor who runs for the judiciary and wins may carry commitments to the bench at least as strong as a judge who runs for the mayoralty and loses. A rule which permits the first threat to become actual while preventing the second might seem irrational.

The argument proves too much. As just stated, it would apply equally to elective and appointive judiciaries. A mayor who is appointed to a judgeship has had the same experience prior to the campaign as the mayor who is elected to a judgeship. Since the influences and commitments to which this argument is addressed are those incurred outside the judicial campaign context, the only way for the state to vindicate its interest would be to bar anyone with prior political exposure from judicial office, a rule as absurd as it is constitutionally suspect.

state judge resign his office prior to becoming a candidate for non-judicial office bears a reasonably necessary relation to the achievement of the state's interest in preventing the actuality or appearance of judicial impropriety. Such a requirement offends neither the first amendment's guarantees of free expression and association nor the fourteenth amendment's guarantee of equal protection of the laws. The judgment of the district court is therefore reversed and the mandate shall issue forthwith.

REVERSED.

## APPENDIX I

The following states have adopted rules of judicial conduct substantially identical to Louisiana's Canon 7(A)(3). Unless otherwise indicated, the canon is numbered 7(A)(3) in each code.

States marked with an asterisk have been identified by the American Judicature Society as having have adopted Codes of Judicial Conduct based on the A.B.A. Code or its predecessor.

ALABAMA *

| | |
|---|---|
| ALASKA | Alaska Stat., Rules of Court Procedure and Administration |
| ARIZONA | 17A Ariz.Rev.Stat.Ann., Sup.Ct.R. 45 (Pocket Part 1977) |
| COLORADO | 7 Colo.Rev.Stat., Code of Judicial Conduct (1973) |
| CONNECTICUT | Kaye, Mollier, 1 Conn.Prac., Code of Judicial Conduct (Pocket Part 1977) |
| DELAWARE | 16 Del.Code Ann., Del. Judge's Code of Judicial Conduct (1975) |
| DISTRICT OF COLUMBIA | |
| FLORIDA | Fla.Rules of Court, Code of Judicial Conduct (1975) |
| GEORGIA | 9A Ga.Code Ann. § 24–3642 (1976); *see* 231 Ga. A1–A29; (1973); 232 Ga. 897 (1974) |

HAWAII *

IDAHO *

ILLINOIS *

INDIANA *

| | |
|---|---|
| IOWA | 40 Iowa Code Ann. § 610 App. Code of Judicial Conduct (Rule 119) |
| KANSAS | 7 Kan.Stat.Ann. § 20–175, Sup.Ct.R. 601 (1974) |
| MARYLAND | 9C Md.Code Ann., Rule 1231 (1977) |
| MICHIGAN | Mich. Court Rules, Code of Judicial Conduct (1977) |
| MINNESOTA | Minn. Rules of Court, Code of Judicial Conduct (1977) |
| MISSOURI | Mo. Rules of Court, Rule 2, (1977) |

NEBRASKA *

| | |
|---|---|
| NEVADA | 1 Nev.Rev.Stat., Sup.Ct.R. 235 (1977) |
| NEW JERSEY | Rules Governing the Courts of N.J., Code of Judicial Conduct, Canon 7(A)(2) (1977) |
| NEW MEXICO | 4 N.M.Stat.Ann. § 16–11 (Pocket Part 1975) |
| NEW YORK | 29 N.Y. [Jud.App.] Law (McKinney), Code of Judicial Conduct (1975) |

| | |
|---|---|
| NORTH CAROLINA | 4A N.C.Gen.Stat.App. VIII A (1975) |
| NORTH DAKOTA * | |
| OHIO | Rules Governing the Courts of Ohio, Code of Judicial Conduct (1977) |
| OKLAHOMA | Okla. Court Rules & Proc., Code of Judicial Conduct (1976) |
| OREGON * | |
| PENNSYLVANIA | Pa. Rules of Court, Code of Judicial Conduct (1977) |
| RHODE ISLAND | 2B R.I.Gen.L., Canons of Judicial Ethics, Canon 27 (1976) |
| SOUTH DAKOTA | 7 S.D. Compiled Laws Ann. § 16–2–App. (Pocket Part 1977) |
| TENNESSEE | 1 Tenn.Code Ann., Sup.Ct.R. 43 (Supp.1976) |
| TEXAS | 1A Tex.Rev.Liv.Stat.Ann. Title 14, App. B (Vernon) (Pocket Part 1976) |
| UTAH * | |
| VERMONT | Vt.Stat.Ann. § 12 App. VIII, A.O. 10 (Pocket Part 1977) |
| VIRGINIA * | |
| WEST VIRGINIA | 1 W.Va.Code App., Code of Judicial Conduct (Pocket Part 1977) |
| WISCONSIN | Wis.Stat.Ann. § 256 App., Code of Judicial Conduct, Rule 3 (West) (1971) |

* Source: Am. Judicature Soc'y, Resource Materials for 5th National Conference of Judicial Disciplinary Commissions, Table No. 5 (1976).

---

FAY, Circuit Judge, dissenting.

With the greatest respect for the en banc decision, I feel compelled to dissent. Seldom has this Court been presented with issues more complex and important than the ones before us today. In his usual scholarly fashion, Judge Goldberg has astutely illustrated that the law which we are to apply is in a state of flux, and that reconciling the plethora of cases in this field is near to impossible. For that reason alone, it is difficult for me to quarrel with whether or not the tests which he proposes should govern the issues before us. A review of the relevant case law has brought to my attention no better way to handle these issues.

I interpret the Court's First Amendment test to be that state restriction on political activities of public employees (where such activities contain substantial nonspeech elements) is constitutionally permissible if the state has a compelling interest, and the challenged restriction is *reasonably necessary* to further that compelling interest. Majority opinion p. 299 *supra*. The majority then proceeds to adopt the same standard of review for its equal protection analysis. Majority opinion p. 303 *supra*.

My problem with this case revolves around the equal protection issues—and my concern is not with the test which the majority adopts, but rather in the application of this test. Judge Goldberg correctly points out that the equal protection problem in the present case is that judges running for election to non-judicial office are singled out. The state makes two classifications. First, any judge may run for judicial office without resigning his seat on the bench. A classification is thus established between judges who wish to run for judicial office and judges who wish to run for non-judicial office. Moreover, anyone other than a judge may run for non-judicial office without resigning the office he holds at the time he announced his candidacy and quali-

fies.[1] A second classification is thus established between judges and all other office holders. Therefore, if we apply the test proposed by the majority, the issue to be determined is whether these classifications are *reasonably necessary* to the admitted compelling interest Louisiana has in maintaining the integrity of its judiciary.

These classifications are troublesome. There appears to me to exist no legitimate reason to distinguish between judges who run for judicial office and judges who run for non-judicial office. Judge Cassibry in his findings of facts, 438 F.Supp. 599, stated that:

> No differences have been shown to exist between the conduct of a political campaign for a judicial office and the conduct of a political campaign for a non-judicial office, and the evidence in the record supports the contention that such campaigns are conducted in the same ways.

What Judge Cassibry's finding means is that since judicial and non-judicial elections are conducted in the same manner, a judge who runs for any other judicial office is subjected to the same potential corrupting influences as would be a judge who runs for any non-judicial office. Why then is it reasonably necessary to treat differently judges who are candidates for non-judicial office? How could members of the legal profession, political parties, vested interest groups and all others interested in elected positions fail to align themselves with one candidate or another in a contest for a judicial office? It is not difficult to imagine a situation with two or more judges seeking higher positions while serving in a judicial capacity. Surely at least one will lose. The record shows no basis for any less nor any more concern based upon such classification. And of course in any such race there could well be one or more non-judicial office holders likewise appealing to the same "power-groups." Certainly if judicial integrity is our concern, there is no legitimate basis to exclude judges who run for judicial office.

While we are not dealing with a judge running for a judicial office, the classification issue is squarely before us. What justification is there for the total lack of equal concern by the Louisiana legislature when non-judicial office holders seek non-judicial offices? The majority argues most persuasively the need for "honest judges." Is there less need for "honest mayors"? Is there less need for "honest governors"? The list is endless and the answer obvious. The legal question presented is not so easily answered.

The majority rests its opinion upon a state concern and reasonably necessary restrictions—not the unique aspects of judicial elections for indeed the experienced trial judge found there are none. I would agree that judicial responsibilities are unique and suggest they are also totally incompatible with the elective process. Certainly the federal appointive process and widespread state use of "merit retention" programs[2] recognize this feature of the third branch. But Louisiana has not removed its judicial candidates from the political arena. It could be argued the state has rather tied one hand behind a judge's back should he decide to run for any office other than judicial. This is hardly demonstrative of a legitimate concern for "good government". Nor, in my opinion, is it a classification consistent with the equal protection clause of the Fourteenth Amendment.

Resign to run laws do have merit and can be upheld.[3] At least one state, Florida, has

---

1. The Governor of Louisiana could hypothetically run for any other elected position while holding office.

2. States differ in whether judges are first appointed and then run on their record (Missouri plan), to those having nominating commissions (such as those instigated by President Carter), to those with screening panels which select a list of qualified candidates from which the Governor makes his appointments (Florida).

3. A three judge panel has upheld those portions of Florida's resign to run law which are relevant to this case. *See Stack v. Adams*, 315 F.Supp. 1295 (D.Fla.1970); *Deeb v. Adams*, 315 F.Supp. 1299 (D.Fla.1970). It is interesting to note, however, that in *Stack* Florida law was held to be unconstitutional as applied to a pub-

passed muster by showing the same concern discussed by the majority toward all office holders—not merely judges. While that may not be the only possible classification able to withstand attack, it is extremely impressive by its equal treatment.

Recognizing this case as a difficult one and my voice as a lonely one, I, nevertheless, feel obliged to dissent. Classifications have been set up by the Louisiana statute and Canon which make little sense if the state of Louisiana is sincere about preserving the integrity of its judiciary. If, however, the state is not sincere in this belief, then a reevaluation of the First Amendment claim would be warranted since restrictions on First Amendment rights cannot be justified by a state interest that is less than compelling. Finding the present classifications violative of the Fourteenth Amendment, I would affirm the action of the trial court.[4]

lic official who desired to run for office of United States Representative. The court reasoned that requiring a candidate for Congress to resign from office as a condition precedent to running for that position created an additional qualification not provided by the Constitution for election to Congress. The court held that the qualifications section of the Constitution was exclusive, and that a state could neither add to nor take away from it. While it has not been raised by any of the parties before this Court, one wonders whether the Louisiana stat-

ute is not vulnerable to a similar attack. Since the plaintiff is not running for a federal office, it is doubtful that he is the proper party to bring such an attack.

4. I concur in those portions of the Court's en banc opinion which deal with the questions of jurisdiction and mootness.